## EMIGRANT COMPANY *v.* COUNTY OF WRIGHT.

The legislature of Iowa having, by an act passed Feb. 2, 1853, granted to the counties in which the same were respectively situated the swamp and over-flowed lands to which the State was entitled under the act of Congress of Sept. 28, 1850 (9 Stat. 519), the county of Wright presented its claim to the Department of the Interior. Having been informed by A., its agent, that the same had been rejected, and that, under the ruling adopted, but little hope remained of its final allowance, the county, July 9, 1862, through its board of supervisors, entered into a contract with the American Emigrant Company to convey to it "all the swamp and overflowed lands of said county, and all the proceeds thereof, and claim for the same on the United States and all other parties," the company agreeing, in payment therefor, to spend $500 in such public improvements in the county as the board should require, to take the lands subject to the provisions of the said act of Congress and the exist-ing laws of Iowa, and to release the State and the county from any liability to reclaim the lands. The contract was submitted to the vote of the county, and eighty-nine out of the ninety votes which were cast were in favor of affirming it. Neither the supervisors nor the voters knew the nature or the value of what they were selling. The company was informed in regard to both, and it withheld the information from the county officers. Subsequently, A., who had become the agent of the company, and was then acting in its interest, procured the reversal of the former ruling of the department, pre-sented the renewed claim of the county, and secured an allowance of several hundred acres of unsold lands in place, $981 in money, and scrip for about six thousand acres in lieu of swamp lands which had been sold by the United States. Jan. 7, 1867, the county, in fulfilment of the contract, conveyed to the company, by deed, a large quantity of lands. The county, in 1870, no improvements having been made, filed this bill, praying for the annulment and cancellation of the contract, for a reconveyance of the lands, saving the rights of intermediate purchasers, and for an accounting, so far as the com-pany had sold said lands, or received money on account of swamp lands due the county. *Held,* 1. That the fact that all the parties knew that they were dealing with a trust-fund devoted by the donor to a specific purpose demanded the utmost good faith on the part of the company. 2. That, in view of the provision for the diversion of the fund, the gross inadequacy of the compensa-tion, and the successful speculation at the expense of the rights of the public, the county is entitled to the relief prayed.

APPEAL from the Circuit Court of the United States for the District of Iowa.

The facts are stated in the opinion of the court.

*Mr. J. A. Harvey* and *Mr. C. C. Nourse* for the appellant.
*Mr. D. D. Chase,* contra.

MR. JUSTICE MILLER delivered the opinion of the court.

On the 28th of September, 1850, Congress passed an act

(9 Stat. 519) granting all the swamp and overflowed lands, made unfit thereby for cultivation, to the States in which they were situated.    This grant was made to enable the states to reclaim those lands; and a proviso to the second section declares " that the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid."    The Secretary of the Interior was required to make out accurate lists and plats of the lands described as aforesaid, and transmit the same to the governors of the States; and at the request of the governors to cause patents to be issued, which should vest the fee-simple to said lands in the States, subject to the disposal of their respective legislatures.

For some reason, not necessary to be inquired into now, but which has been the source of much controversy between the States and the Department of the Interior, and also of much litigation between parties claiming under the grant and those claiming adversely to it, the Secretary failed to make any such selections and lists of swamp lands as the act contemplated, except as he was induced to make partial and imperfect lists at the suggestion of persons acting for the States on various occasions.

The State of Iowa, by the act of Feb. 2, 1853, granted these lands to the counties of that State in which they might be found, with an injunction that the lands and their proceeds should be appropriated to reclaiming the swamp lands; and if, when this was accomplished, any thing was left, to building roads and bridges over the same; and, lastly, the remainder to be. used in building roads and bridges in other parts of the county.

By subsequent legislation of the State the counties were authorized to depart from this injunction, and to use the lands for public buildings and internal improvements; but the assent of the majority of the voters of the county to such purpose was required.    It also authorized the sale of all said lands to any person or corporation by a written contract, to be in like manner submitted to the vote of the county; but such sale was subject to the following proviso: " That no sale, contract, or

other disposition of said swamp or overflowed lands shall be valid, unless the person or company to whom the same are sold, contracted, or otherwise disposed of, shall take the same, subject to all the provisions of the act of Congress of Sept. 28, 1850, and shall expressly release the State of Iowa and the county in which the lands are situate from all liability for reclaiming said lands."

On the ninth day of July, 1862, a written contract for the sale of the swamp lands of Wright County, and all interest therein, and of the claim of the county for indemnity against the United States for swamp lands which had been sold by the government, was signed by the supervisors of the county of Wright and the American Emigrant Company, by their agent, H. C. Crawford, and attested by the clerk and seal of Wright County. This contract was submitted to the vote of the county, and affirmed by a majority. It appears that ninety votes were cast, and all of them but one were for affirming the contract. On the seventh day of January, 1867, the county, in fulfilment of the contract, made a deed of conveyance of a large list of lands to that company.

The case before us is a bill in chancery to set aside said contract and deed, and for an accounting, so far as the company has sold lands or received money on account of swamp lands due to said county. On final hearing, the court made a decree to that effect.

The American Emigrant Company claims to be organized as a corporation under the laws of the State of Connecticut, and its professed object is to aid the immigration of foreigners to this country, by settling them on farm lands in the West. It does not appear that during the fifteen or twenty years that it has been in existence it has done much, if any thing, in the way of promoting immigration. But it does appear that in the State of Iowa it has done a very large business in purchasing from the counties their contested claims for swamp lands, under the act of Congress and the statutes of the State to which we have referred.

How far this company was instrumental in procuring the legislation authorizing the counties to sell out these unascertained interests in the swamp-land grant, and to connive at a

diversion of the lands from the purposes of the grant, we are not informed.

Some of the peculiar provisions of the act of 1858, passed about the time this company was organized, by which the counties were authorized to sell these lands, and claims for land, to corporations, and to take from the purchaser an obligation to hold the State and county harmless for any diversion of the grant from its original purpose, when taken in connection with the policy of the company as revealed in the depositions of its officers, leave strong ground of suspicion that those who alone have profited by the statute had something to do with its enactment.

The present bill is based upon three principal propositions, to wit: 1. That the contract is void on its face, because it is not authorized by the statute, and contemplates a diversion of the fund, in violation of the original grant.  2. That the vote of the county affirming it is void, because of want of legal notice of the time and place of voting.  3. Because of fraud in the manner in which the contract was procured.

In regard to the second of these propositions, which charges want of notice of the vote, we do not think it is established, so far as to render the vote void.

As regards the first proposition, it is not necessary to decide it in this case, and we do not decide that the contract is, for that reason alone, void.  But we are of opinion that any purchaser of these lands from the county, or of the claim of the county to indemnity, must be held to know that in the hands of the county they were impressed with an important public trust, and that, in examining into the fairness and honesty of such a purchase, this consideration constitutes an important element of the decision.  This is especially so when both the county and the purchaser agree in writing that the latter shall bear all responsibility, and shall indemnify the former for any violation of that trust.

In entering upon this inquiry, the first thing that strikes one upon the face of the record is the very vague idea which the supervisors of the county, and still more the citizens who voted on the proposition, must have had of the value of the thing they were selling.  What lands were swamp lands had never

been clearly settled by the department, and how many acres were or ever had been embraced by the grant in Wright County was still more uncertain.  It was obviously the dictate of ordinary prudence in dealing with a case like this that the citizens of the county should know what they were selling, as well as what they were going to get for it.  It is clear they knew neither.  They were selling the chances in a controversy with the government of the United States.  A claim which would probably be good for several hundred acres, and which resulted in the allowance of over six thousand acres.  What were they to get for it?  The sum of $500, in public improvements.  The nature and character of these improvements, the price of the work, and the time of its completion were left unsettled.

The result is that none have been built, and the Emigrant Company secures about six thousand acres of land of the value of $1.25 per acre, and $981 in cash.  Over $8,000 for the vague promise of doing $500 worth of public improvements. The very inadequacy of the consideration is enough to throw the strongest suspicion on the fairness of the transaction.

The county of Wright, by the census of 1860, had a population of six hundred and fifty-three souls, and the vote that was given amounted only to ninety.  Of these, taking the usual proportion, probably less than one-half had any real interest in the county.

What a chance for the exercise of the arts of persuasion in procuring a contract, all the advantages of which should be on one side, but which must affect the interests of the county after it should have become well populated.

But we are not left to surmise on this subject.  This small population was divided into seven civil townships, each one of which had a supervisor; and these supervisors, when assembled at the county seat, constituted the governing body of the county.  When the Emigrant Company began their operations with Wright County, they did not lay their proposition before the board of supervisors at a regular meeting; but their agent, a man by the name of Crawford, who signed the contract for the company, taking with him a jug of whiskey, went round to the house of each of these men, and thus gaining their assent to his project, brought them together in his own wagon to the

county seat, on a day not provided by law, nor authorized by any previous order or notice, and there induced them to sign this contract. Whether a like influence attended the subsequent voting at precincts, where the average vote was twelve to a township, we are not informed. But there is no reason to doubt that the arguments used with the supervisors were potent with the voters.

It appears that for some time before this contract was made the county had been urging her claim to swamp lands, before the department at Washington, through Savary, who acted as her agent. A short time before this contract was made, he informed the authorities of the county that their claim had been rejected, and that this rejection was accompanied by the announcement of a rule which left but little to hope for on the part of the county. Very shortly after this, Crawford, as the agent of the Emigrant Company, made his appearance in the county, and procured the contract we have mentioned.

As soon as this was done, Savary, as the agent of the Emigrant Company, by the assistance, as he says, of able lawyers, and in the cases of other counties with which the company had similar contracts, inaugurated proceedings to procure the reversal of the rule announced by the department. Succeeding in this, he presented the renewed claim of Wright County, and secured the allowance of several hundred acres still unsold in the county, and money and scrip for six thousand acres to be located elsewhere, in lieu of swamp lands sold by the government.

It is not a violent presumption, under all the circumstances of this case, that when, just after Savary had made the impression on the supervisors of Wright County that their case was hopeless, Crawford appeared in Wright County, he had some information of a different character on which he acted, and which was not communicated to the supervisors.

The record in this case is a voluminous one, consisting largely of depositions of witnesses. We are not convinced that any false representations were made by the agents or officers of the Emigrant Company. But the impression made upon us by the whole testimony is, that the officers and citizens of the county were in gross ignorance of the nature and value of what

they were selling; that the Emigrant Company, on the other hand, were well informed in regard to both, and withheld this information unfairly from the officers of the county; that the sudden change of the relationship of Savary from an unsuccessful agent of the county to a successful agent of the company requires an explanation which has not been satisfactorily given; that the fact that all parties knew they were dealing with a trust fund devoted by the donor to a specific purpose demanded the utmost good faith on the part of the purchaser; that so far from this, there is a provision for a diversion of the fund to other purposes, a gross inadequacy of consideration, and a successful speculation at the expense of the rights of the public.

For these reasons we concur with the Circuit Court that the contract should be rescinded, and that, saving the right of intermediate purchasers, there should be an accounting and a reconveyance, so far as may be.

*Decree affirmed.*

MR. CHIEF JUSTICE WAITE and MR. JUSTICE STRONG dissented.