## EMIGRANT COMPANY *v.* COUNTY OF ADAMS.

1. Though the grant by the act of Congress of Sept. 28, 1850 (9 Stat. 519), of the swamp and overflowed lands to the States in which they lie, is declared to be made for the exclusive purpose of enabling such States, with the proceeds thereof, to reclaim the lands by means of levees and drains, it is questionable whether the security for the due application of the proceeds does not wholly rest upon the good faith of the several States, and whether they may not exercise their discretion in this behalf without being liable to be called to account, and without affecting the title to the lands: at all events, it seems that Congress alone has the power, in a clear case of violation of the trust, to enforce the conditions of the grant, by revocation or otherwise; and since, by the act, the proceeds are to be applied to the designated purposes only "as far as necessary," each State has, at least, a large discretion as to the "necessity" of employing the proceeds to the reclamation of the lands.

2. A grant, subject to the conditions of that act, made by a State of its swamp

and overflowed lands to the several counties in which they are situated, to be disposed of for general county purposes, is valid, and the county which has disposed of them in pursuance of the State grant cannot rescind its contract on the ground of its being a violation of the act of Congress.

3. In Iowa, such a contract, if approved by a vote of the people of the county, under the act of the legislature of that State passed in 1858, is valid, though the lands be disposed of for less than one dollar and a quarter per acre; and, if it includes also a sale of the claim of the county against the United States for indemnity for swamp lands sold by the latter, the county cannot maintain a bill in equity to set it aside, though such sale be within the law prohibiting the assignment of claims against the go ᵛrnment.

4. If the purchaser from the county under such a contract was bound thereby to do certain acts, such as to introduce a certain number of settlers within a certain period, or to reclaim the lands, his obligation, if not made a condition of the sale, lies in covenant merely, and, if unperformed, does not avoid the sale. It is only when covenants are mutual and dependent, or when their performance is made an express condition, that a breach of them involves an avoidance of the contract.

APPEAL from the Circuit Court of the United States for the District of Iowa.

The facts are stated in the opinion of the court.

The case was argued at the last term by *Mr. J. A. Harvey* and *Mr. N. M. Hubbard* for the appellant, and by *Mr. Frank M. Davis* and *Mr. R. P. Lowe* for the appellee.

The case was reargued at the present term for the appellee by the same counsel, and for the appellant by *Mr. Benjamin F. Butler* and *Mr. O. D. Barrett*.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This case arises upon a bill in equity originally filed by the County of Adams, Iowa, against The American Emigrant Company, in the District Court of that county, and afterwards transferred to the Circuit Court of the United States. The object of the bill was to rescind a certain contract between the county and the company, made in September, 1862, whereby the county agreed to convey to the company its swamp lands, and its claim against the government for indemnity on account of swamp lands belonging to it and which had been sold by the public land officers; also to rescind a deed executed on behalf of the county in pursuance of the said contract; and to recover back the moneys and proceeds which the defendant had realized from the property and the said claim. The case is

of the same general character as that of *Emigrant Company* v. *County of Wright*, 97 U. S. 339. The act of Congress, and the laws of the State of Iowa which bear upon the case, and the character of the general operations of the defendant, are fully set forth in the opinion in that case, and need not be repeated here. Suffice it to say that on the thirtieth day of September, 1862, a written contract, similar to the contract in that case, for the sale of the swamp lands of Adams County, and of all the fund and claim of the county on the general government therefor, was signed by the chairman and clerk of the board of supervisors of said county, and by the American Emigrant Company, by its agent F. C. D. McKay, and was recorded among the proceedings of the board. By this contract the company agreed to take the lands and fund and claim and to make for the county any public work or improvements therefor which the board of supervisors might request, and which were authorized by law, to the amount of $2,000, at any time after Oct. 1, 1863; or to pay the board, if they preferred to do the work themselves, the sum of $2,000 in money by the 1st of January, 1865. It was further agreed that the lands should not be taxed as long as the county held the legal title; and the company agreed to settle all the lands fit for settlement with white settlers and purchasers, by selling farms of the usual size, one-third in three years, another third in five years, and the whole in eight years. It was also declared that the company took the lands subject to the provisions of the act of Congress of Sept. 28, 1850, and expressly released the State of Iowa and the county from all liability in reclaiming said lands, or in the draining thereof; and that any contract existing between the county and any person in relation to said lands or funds was to be respected and fulfilled by the company.

Subsequently a deed was executed in pursuance of this contract by the supervisors of the county, bearing date the 7th of September, 1863, and purporting, for the consideration of $2,000, to convey to certain trustees, in trust for the American Emigrant Company, certain lands particularly described, stated to amount in the aggregate to $3,680\frac{51}{100}$ acres, although the several parcels foot up only 2,235 acres, and the parties con-

cede that, after certain reservations mentioned in the contract, the actual quantity conveyed by the deed was only a trifle over 2,000 acres. The deed contained an agreement on the part of the county that the lands within the county which might at any time be duly selected as swamp or overflowed lands, and all such lands as might not be included in the conveyance, if any, should be conveyed on request, and that any proceeds of the claim on the United States, if any should be received, should, on like request, be assigned and transferred to said American Emigrant Company, its trustees or assigns; and that any lands that should be located under or by any scrip, which might be obtained on said claim, should also be conveyed, on request, to said company, its trustees or assigns.

It appears from the proofs that the American Emigrant Company has sold about 1,500 acres of the land, upon some of which the purchasers have made improvements; and has paid to the county the said sum of $2,000 mentioned in the contract (which was paid in June, 1865), and has also paid certain expenses incurred on behalf of sixteen different counties with whom the company had like contracts (of which Adams County was one), the one-sixteenth part of which, as stated by the defendant, amounts to $4,562; and a further sum of $1,200 paid to one Grinnell as agent of Page, Adams, and Montgomery Counties, — all together, on behalf of Adams County, about $7,000.

On the other hand, the company has received under the contract, from the United States, in cash, the sum of $6,075.11; and in addition to the lands specifically conveyed, patents have been issued to the county for 2,043 acres, to which the defendant is entitled if the contract is carried out; and there is still an unadjusted claim for about 3,000 acres more.

The Circuit Court decreed the contract and deed to be void, and ordered a restitution of all moneys and securities received by either party by virtue thereof, saving the rights of *bona fide* purchasers, and referred the matter to a master to take the necessary account. From this decree the American Emigrant Company appealed; and the question for us to decide is, whether it is or is not sustained by the pleadings and proofs in the cause.

The grounds laid by the bill of complaint for avoiding the contract are, in substance, as follows : *First*, that the sale of the county's swamp lands was made at a much less price than the law allowed them to be sold for; that by an act of the legislature of Iowa, then in force, regulating the disposal of such lands, it was made unlawful to sell the same at a less price than $1.25 per acre, whereas by the said contract nearly 8,000 acres were sold for $2,000 ; *secondly*, that the sale of the county's claim against the United States for indemnity was void, as being contrary to law ; *thirdly*, that the contract and deed were procured by false and fraudulent representations, both as to the quantity of lands comprised therein and as to the validity and condition of the claim against the United States for indemnity, it being represented that the county was entitled to only about 2,000 acres of land, and that the claim for indemnity had been rejected, and was of no value ; that these representations were made by agents of the defendant, who well knew the falsity thereof, to the officers and agents of the county, who were entirely ignorant in the premises, and liable to be easily imposed upon ; *fourthly*, that false representations were made as to the object of buying the lands, — namely, that the defendant desired them only for immediate settlement and improvement, whereas it has never made any effect to drain or cultivate them, and never had any intention of doing so ; *fifthly*, that the delivery of the deed was procured by fraud, the same having been executed as an escrow, and left with the clerk of the board of supervisors to be delivered only upon the execution and delivery of a mortgage upon all the lands to secure a compliance with the terms of the contract; whereas, by a fraudulent combination with said clerk the defendant procured the delivery and recording of said deed without giving any such mortgage. The bill also set up insufficient consideration for said lands and the indemnity claim, and failure of consideration ; that the defendant had failed to drain or improve the lands, and to release the county from its obligations in that behalf ; that it had refused to pay a certain claim for over $2,000 against said county for services of an agent, in consequence of which the county had been prosecuted and obliged to pay $2,700 for judgment and

costs.  It was also charged that the defendant had made use of fraudulent misrepresentations and bribery to procure a vote of the people of the county in favor of the sale (which was required by the laws, of the State).  The bill further stated that, on discovery of the frauds thus charged, the board of supervisors passed a resolution repudiating and rescinding the contract; and concluded by praying that the contract be declared void, and for an account.

The answer specifically denies the charges of the bill, and claims, in substance, that the contract was fairly entered into, and that the complainant had failed to perform its part thereof, and had prevented the defendant from fulfilling its part, so far as it remained unfulfilled.  The answer not being sworn to, except by an agent of the defendant, who was not a party to the bill, of course is not evidence.

A great deal of evidence was produced, showing the proceedings had in the General Land-Office and in the State in relation to the claim and location of the swamp lands, and in relation to the claim for indemnity against the government; the services of agents; the negotiations between the parties respecting the contract in question; the representations that were made; the proceeds and value of the lands, and the disposition thereof.  And although it is evident to us, from all the evidence taken together, that the agents of the defendant were well informed in regard to the rights of the county, and that the supervisors of the county were quite ignorant thereof, and liable to be easily imposed upon; and although it is very clear that the latter believed that the lands to which the county was entitled were only about 2,000 acres, and that the claim for indemnity against the government was of no value, — yet we see no sufficient proof that the contract was procured by false and fraudulent representations; and we are unable to sustain the decree of the Circuit Court on this ground. The case, in this respect, as to the character of the proofs,.is very far short of that of *American Emigrant Co.* v. *County of Wright, supra.*

But there was one aspect of it which, at the conclusion of the first hearing, we thought deserving of consideration, and that was the general character of the transaction, viewed in

connection with the act of Congress by which the swamp and overflowed lands were granted to the State. This act was passed Sept. 28, 1850 (9 Stat. 519), and is entitled " An Act to enable the State of Arkansas and other States to reclaim the ' swamp lands' within their limits." By the first section it was enacted, " That to enable the State of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands, made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be and are hereby granted to said State." The fourth section declared that the provisions of the act should be extended to, and their benefits be conferred upon, each of the other States of the Union in which such swamp or overflowed lands might be situated. These lands, therefore, were granted to the several States in which they lie for a purpose expressed on the face of the act; and that purpose was " to enable the State to construct the necessary levees and drains to reclaim them." The second section of the act, after prescribing the method in which the lands should be designated and patented to the State, concluded with the following proviso : " *Provided, however*, that the proceeds of said lands, whether from sale or direct appropriation in kind, shall be applied exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid." Our first view was, that this trust was so explicit and controlling as to invalidate the scheme finally devised by the legislature of Iowa for the disposal of the land, and under which the contract in question was made. But on more mature reflection, after hearing additional argument, we are satisfied that such a result did not necessarily follow. The history of the State legislation on the subject is briefly as follows : —

The legislature of Iowa, by an act which took effect Feb. 2, 1853, granted the lands to the several counties in which they were situated, subject to the conditions of the act of Congress and such laws as the legislature might thereafter pass. It created a drainage commissioner's office, and county surveyors to lay out drains ; after draining, the lands were to be appraised and sold at auction to the highest bidder in small tracts ; and

it provided for reclamation of the lands in detail.    Other acts
were subsequently passed in pursuance and furtherance of this
general scheme, which was clearly conformable to the purposes
of the congressional grant.    The difficulty we had arose upon
the subsequent act of the legislature of Iowa, passed in 1858,
by which it was declared (by sect. 1) that it should be com-
petent and lawful for the counties owning. swamp and over-
flowed lands to devote the same, or the proceeds thereof, either
in whole or in part, to the erection of public buildings for the
purpose of education, the building of bridges, roads, and high-
ways, or for building institutions of learning, or for making
railroads through the county or counties to which such lands
belonged ; and (by sect. 2). it was enacted that the proper
officers of any county might contract with any person or com-
pany for the transfer and conveyance of said swamp or over-
flowed lands, or the proceeds thereof, or otherwise appropriate
the same to such person or company, or to their use, for the
purpose of aiding or carrying out any of the objects mentioned
in the first section.    It was further provided that, before any
such contract could take effect, the proposition should be sub-
mitted to a vote of the people of the county, for their approval
or rejection.    There was a proviso in the third section that no
such sale should be valid, unless the person or company pur-
chasing should take the lands sold subject to all the provisions
of the act of Congress (before referred to), and should ex-
pressly release the State of Iowa and the county from all lia-
bility for reclaiming said lands.    A supplement was passed in
1862, providing that no county should be released from its
obligation to make the necessary drains and levees contem-
plated by the act of Congress passed Sept. 28, 1850, and the
act of assembly passed in 1853.

The contract in dispute was made under this law, and our
first impression was that it introduced a scheme subversive of
the trust imposed upon the State by the act of Congress ; that
its effect was to devote the lands and proceeds thereof to
purposes different from those which the original grant was
intended to secure ; that it drew off, or endeavored to throw
off, all public responsibility in relation to the trust ; and
hence that the scheme itself and the contract based upon it

were void. But a reconsideration of the subject has brought us to a contrary conclusion. The argument against the validity of the scheme is, that it effects a diversion of the proceeds of the lands from the objects and purposes of the congressional grant. These were declared to be to enable the State to reclaim the lands by means of levees and drains. The proviso of the second section of the act of Congress declared that the proceeds of the lands, whether from sale or direct appropriation in kind, should be applied exclusively, as far as necessary, to these purposes. This language implies that the State was to have the full power of disposition of the lands; and only gives direction as to the application of the proceeds, and of this application only " as far as necessary " to secure the object specified. It is very questionable whether the security for the application of the proceeds thus pointed out does not rest upon the good faith of the State, and whether the State may not exercise its discretion in that behalf without being liable to be called to account, and without affecting the titles to the lands disposed of. At all events, it would seem that Congress alone has the power to enforce the conditions of the grant, either by a revocation thereof, or other suitable action, in a clear case of violation of the conditions. And as the application of the proceeds to the named objects is only prescribed " as far as necessary," room is left for the exercise by the State of a large discretion as to the extent of the necessity. In the present case it is not shown by allegations in the bill, or otherwise (if such a showing would be admissible), that any necessity existed for devoting the proceeds of the lands in question to the purposes of drainage. No case is shown as the basis of any complaint, even on the part of the general government, much less on the part of the county of Adams, which voluntarily entered into the arrangement complained of. Our conclusion, therefore, is, that this objection to the validity of the contract cannot prevail.

Having disposed of the questions of fraud and of the supposed invalidity of the State legislation, the other grounds alleged by setting aside the contract will not require extended discussion.

One of these grounds is that the sale of the county's swamp

lands was made at a much less price than the law allowed them to be sold for; that by an act of the legislature of Iowa then in force, regulating the disposal of such lands, it was made unlawful to sell them at a less price than $1.25 per acre. This question has been decided adversely to this view by the Supreme Court of Iowa in *Audubon County* v. *American Emigrant Co.*, 40 Iowa, 460. It was there held that, when a county devotes its swamp lands to purposes specified in the act of March 28, 1858, it is not limited in price to $1.25 per acre, but may devote them to such purposes, upon such terms as may be agreed on, if the contract be approved by a vote of the people. The contract in that case was substantially the same as in this, and was sustained. As this is a question of State law, if we had any doubt upon it, we should defer to the decision of the State court.

Another question suggested for relief is, that the sale of the county's claim against the United States for indemnity for lands sold by the government was contrary to law, and void. If the law prohibiting assignments of claims against the government applies to such a claim as that which was the subject of the contract in this case, the government might have refused to pay it; but after it was paid, the county, being *particeps criminis*, cannot, against its own act, have a standing in a court of equity either to recover it from the appellants, or to have the contract avoided. So far as the State laws are concerned, the Supreme Court of Iowa has frequently sustained contracts precisely like that now under consideration. See *Audubon County* v. *American Emigrant Co., supra; Allen* v. *Cerro Gordo County*, 34 Iowa, 54; *Page County* v. *American Emigrant Co.*, 41 id. 115; *Ringgold County* v. *Allen*, 42 id. 697.

The allegations of the bill to the effect that the Emigrant Company has not fulfilled its engagements with respect to the drainage and settlement of the land, rest in covenant merely, and afford no ground for avoiding the contract. Where covenants are mutual and dependent, the failure of one party to perform absolves the other, and authorizes him to rescind the contract. But here the contract was largely carried into execution soon after its inception. The engagements of the appel-

lants to introduce settlers and the like were to be performed in the future; and their performance was not made a condition, but, as before stated, rested in covenant. In case of a breach, they would lay the foundation of an action, but nothing more.

To the same category belongs the question whether the appellants ought to have paid the claim of Frank M. Davis. The agreement required them to respect and fulfil any contracts then existing between the county and any person in relation to the lands and funds which formed the subject of negotiation. Davis had a claim against the county for services in surveying the lands and in prosecuting the indemnity claim. The county insisted that the appellants should pay this claim, which they refused to do, alleging it to be unjust and collusive. In 1866, Davis sued the county, and obtained judgment for $2,200. In 1869, this judgment, with interest and costs, then amounting to over $2,700, being paid by the county, was formally demanded of the appellants, and they again refused to pay it. It is claimed that this refusal entitles the county to repudiate the whole contract. We do not think so. It is one of those matters that rest in agreement merely, and is not in the form of a condition. The agreement is an independent one, — a part of the consideration of the contract, it is true; but its non-performance raises an action merely, and does not annul the entire contract. We are disposed to think that as the appellants had notice of Davis's suit, and co-operated in its defence, the claim of the county is valid; but, being a mere legal demand, it cannot be recovered in this suit; and we are satisfied that it constitutes no proper ground for the relief sought by the bill.

Looking at the whole case as presented to us, we think that the complainant below was not entitled to a decree, and that the bill should have been dismissed.

The decree of the Circuit Court will be reversed, and the cause remanded with directions to enter a decree dismissing the bill without prejudice to the right of the county to bring an action at law for any breach of the terms of the contract; and it is .

*So ordered.*