[Sac. No. 256.  Department Two.—January 4, 1898.]

## COUNTY OF KINGS, Appellant, v. COUNTY OF TULARE, Respondent.

SWAMP LANDS—TITLE AND CONTROL OF STATE—PROCEEDS OF SALE—COUNTY SWAMP LAND FUND—TRUST—AGENCY FOR STATE.—The swamp and over-flowed lands were granted to the state by the act of Congress of September 28, 1850, and the title was thereby vested in the state, for the purpose of enabling it to reclaim the lands by means of levees and drains; and the control of the swamp lands and of the proceeds of their sale being in the state, without power in anyone but the United States to question the disposal made of the lands or their proceeds, no person and no county has any control over or interest in either lands or their proceeds except as the state has granted it.  The state has not granted  any swamp lands to the counties nor any funds arising from the sale of swamp lands therein, and the establishment of a swamp land fund in the various counties where swamp land districts have been formed was the creation by the state of a trust fund, making the counties and county officials mere agencies of the state, used by it in carrying out the purpose of reclamation, and the state may alter or amend its laws relating to the subject and control the custody of the fund at its pleasure.

ID.—DIVISION OF COUNTY—CUSTODY OF SWAMP LAND FUND—ACTION BY NEW COUNTY NOT MAINTAINABLE.—Upon the division of a county no provision has been made by law for any change in the custody of the swamp land fund of the original county; and it cannot be claimed in such case that the trust has failed for want of a trustee, nor is there any ground for equitable interposition, but the legislature is the appropriate and only source of relief; and no action will lie on behalf of the new county to recover a share of such fund.

APPEAL from a judgment of the Superior Court of Fresno County. Stanton L. Carter, Judge.

The facts are stated in the opinion.

M. L. Short, and H. L. Smith, for Appellant.

F. B. Howard, and T. E. Clark, for Respondent.

CHIPMAN, C.—This action was brought by plaintiff to recover $104,581.72, the proceeds of certain swamp and overflowed and lake lands. A demurrer to the amended complaint was sustained, and, plaintiff declining to amend, judgment passed for defendant, from which this appeal was taken. Briefly summarized, the amended complaint sets forth that plaintiff county was duly organized on May 29, 1893, and embraced certain territory theretofore within the boundaries of defendant county; that before the new county was formed, certain swamp, overflowed, and lake lands, within its boundaries, were sold to sundry persons, pursuant to laws for the sale thereof within this state, and that the purchase price has been paid to the county treasurer of Tulare county, and that no part of the same has since been paid to Kings county, or to any person for its use or benefit; that upon its organization Kings county "became invested with the power to receive into its custody and corporate keeping all the swamp, overflowed, and lake lands in its limits which were not under the control and management of private ownership; and also became invested on said twenty-ninth day of May, 1893, with full power and authority to take, hold, and keep, all such sums of money as had been paid into the treasury of said Tulare county for any and all lands belonging to the state of California, as well also as to take and receive from said county of Tulare all moneys of every character and description as has ever been paid in any manner into the said treasury of said Tulare county for any and all swamp and overflowed state lands of any and every kind, . . . . except such portions of said money for said lands as can be shown by said Tulare county to have been paid out in the regular forms and manner prescribed by the laws of this state . . . . to parties legally entitled to recover the same"; that the balance, after making all legal deductions, now held by said Tulare county belonging to said Kings county, amounts to the sum aforesaid;

that the claim was duly presented to and filed with the clerk of the board of supervisors of said Tulare county on May 13, 1895, and payment was refused.

The demurrer is upon the grounds: 1. That the complaint does not state facts sufficient to constitute a cause of action; and 2. That the cause of action is barred by section 41 of the County Government Act, approved March 24, 1893 (Stats. 1893, p. 363), for the reason that the claim mentioned in the complaint was not filed with the clerk of the board of supervisors of Tulare county within a year after the last item of said claim accrued, and because the whole of said claim, and each and every item thereof, accrued more than one year prior to its presentation.

As in our opinion the complaint does not state facts sufficient to constitute a cause of action, it is not necessary to consider the other grounds of demurrer.

It is contended by appellant that the swamp land fund created by the purchase price of the swamp and overflowed lands of the state has been by legislative grant donated to the counties in which the lands sold were situated, in trust for the reclamation of such lands and for the owners thereof; that the county in which the lands are situated is the trustee of this fund, and that the act creating Kings county removed the county of Tulare as trustee of the fund sued for; and as the fund can only be used for the purposes of the trust by order of the board of supervisors of the county in which the lands are situated, the price of which created the fund, Kings county can maintain this action.

Respondent contends that the money claimed by appellant belongs to the state and not to either county; and, if it ever belonged to Tulare county, no law has ever been passed transferring any portion of it to Kings county. The swamp and overflowed lands of the state were granted to it by act of Congress approved September 28, 1850, and by acts amendatory thereof. The title is in the state. The purpose of the grant was to enable the state to reclaim the lands by means of levees and drains. The act of Congress has been construed by the supreme court of the United States to be a grant to the state of full power to dispose of the lands, and to make application of the proceeds

so far as necessary to secure the object specified. No person except the United States can question the disposal made of these lands or their proceeds by the legislatures of the several states. (*American Emigrant Co. v. Adams County,* 100 U. S. 61; *Mills Co. v. Railroad Co.,* 107 U. S. 557; *Hagar v. Reclamation Dist.,* 111 U. S. 701; *United States v. Louisiana,* 127 U. S. 182.) The control of swamp lands and the proceeds of their sale being in the state, no person and no county has any control over or interest in either the lands or their proceeds except as the state has granted it.

The state, by act of April 28, 1855 (Stats. 1855, p. 189), made provision for the sale of these lands at one dollar per acre, the money to be paid to the county treasurers of the counties where the land was located, and to be transmitted to the state treasury by them.

By section 1 of the act of April 21, 1858 (Stats. 1858, p. 198), the proceeds of these lands sold under that or any former act were to be paid into the treasury of the state "as state revenues and credited to the swamp land fund, to be appropriated for the reclamation of said lands as the legislature may direct." The purchaser was required by section 4 to pay to the county treasurer one dollar per acre for the lands purchased, and take duplicate receipts and have them recorded in the office of the county auditor, who should send a copy to the state register.

Section 5 of the act required the county treasurer to pay over to the state treasurer, at the same time and manner as "other state revenues," all moneys received under the act, and send to the controller the names of all purchasers, number of survey, number of acres purchased and amount of money "to be credited to the swamp land fund." Certificates of purchase were to be issued by the state register.

The act of March 28, 1868 (Stats. 1868, p. 50), is entitled "An act to provide for the management and sale of the lands belonging to the state." This is a very elaborate statute of seventy-two sections, and is divided into three distinct parts. It is practically the basis of our present state land system, and appears to have repealed all previous acts. The scheme of reclamation of swamp and overflowed salt marsh and tide lands, substantially as it exists to-day, was there developed. Most of its

provisions relating to reclamation have found their way into the Political Code now in force. Upon the register was devolved the duty "to keep separate and distinct accounts and records in relation to each class of lands to which the state is or may be entitled."

Section 23 of the act required all certificates of location of all state lands to be presented to the county treasurer, and it was made his duty to receive the amount paid in full or in part, and the certificate was also required to be presented to the county auditor, who was required to charge the amount paid to the county treasurer.

Sections 24 and 25 required the county treasurer to report monthly to the state register all moneys received, names of purchaser, etc., and at the end of each quarter to report to the state controller the amount received from each class of lands; this report was to be sent to the register by the controller, and, if reported correct by the register, the controller was to settle with the county treasurer, "provided, that the county treasurer shall retain in his own hands all moneys arising from the sale of swamp and overflowed land, and shall place the same to the credit of a fund to be known as the swamp land fund' of the county, and the same shall be subject to the orders of the board of supervisors, except as may be hereinafter provided."

Section 47 provided for the transfer of the fund then in the state treasury to the several counties, and the county auditor and treasurer were directed, "under direction of the board of supervisors, to place said assets on their books to the credit of the proper swamp land district fund."

By the provisions of this act, and of certain acts next to be noticed, appellant claims that the state granted "the proceeds of the sales of these lands to the county in which they are situated, to hold in trust for the reclamation of the lands under the system provided by the state, or for the owner of the land if he reclaims it by his own labor and means." One of the acts upon which appellant further relies is the act of March 28, 1874 (Stats. 1873-74, p. 770), entitled, "An act to provide for the proper distribution, in the several county treasuries, of funds existing from the sale of swamp lands." The first section directs the board of supervisors, in counties where a swamp land dis-

trict may be organized, upon the application of a party interested, to "direct the auditor and treasurer to set apart from the swamp land fund, in the county treasury, all the money which has been or may hereafter be received in payment of principal and interest in such lands, as a fund to the credit of such district, except such money as may have been previously expended for the benefit of land within the district." Section 2 of the act directs that the money in the district fund "shall be paid out only for the purpose of reclaiming said land, or to the owners of such land after reclamation, as now provided by law." The remaining portion of the act relates to certain deductions to be made for money expended before payment to the owner of any of this fund.

The act of March 31, 1891 (Stats. 1891, p. 243), relied upon, is entitled "An act providing for the payment of all moneys in the state treasury, to the credit of swamp land district funds, to the treasuries of the counties wherein the said swamp land districts are situated, and to provide for the control of the same by the auditor and treasurer of said counties; and prescribing the duties of the controller and treasurer in relation thereto." The title of this act explains its purpose, which was to transfer funds then in the state treasury. Presumably, when this act was passed, some of this swamp land money had found its way into the state treasury, and this act was to put it into the county treasuries. Previous law had done this, and why this act became necessary we are not advised, but it did not provide for an adjustment between counties of funds already in their treasuries, nor does it contain any words of grant or donation to the counties. The general law now governing the subject is to be found in the Political Code, title VIII, article II, chapter 1, which, with the several general laws or parts of the same as remain in force, forms the statute law on the subject.

It is clear from an examination of these various laws that the state has never parted with its title to swamp lands to the counties. The title under all laws passes directly to the purchaser from the state. The only question is as to the disposition made by the state of the proceeds of the sale. The uniform price for these lands has been one dollar per acre. The state has never undertaken to profit by the sale. The purpose of the grant to

the state—to-wit, the reclamation of the lands—seems to have been the governing principle of their disposition and management.

Certain results of the grant of swamp and overflowed lands to the state, and of our legislation respecting those lands, seem clear enough, to-wit, the grant was for the purpose of securing their reclamation; the state has never deviated from a consistent course of legislation to attain that purpose; the state has always retained the absolute control and ownership of the lands and has itself given the evidences of title when sold to purchasers; the state in the earlier legislation required the proceeds of sale to be paid to state officials and to be retained by them in their custody, although county officials were made use of as agencies, and, as in the sale of other state lands, to receive and transmit the moneys paid by purchasers. Later, the moneys paid by purchasers, and the moneys derived from assessments levied for reclamation purposes, were paid to the county officials and retained by them to be placed in a fund called the "swamp and overflowed land fund." By the act which inaugurated this change it was also provided that all such moneys in the state treasury should be transferred to the several counties where swamp land districts had been formed to be placed in this same swamp land fund.

The state has ceased to be the immediate custodian of the fund, but there is nothing in any act that confers upon any county any property right in or to this fund, and there is nothing in any act from which it may be inferred that the state has relinquished its right of legislative control over it, or has renounced or transferred its trust. The scheme of reclamation provided by the legislature involved much detail and made it necessary for the owners of the land to have frequent communication with the officials controlling the fund, and hence, both as matter of convenience to the landowner and to facilitate the purpose of the grant to the state, the fund was placed in the county treasuries. In a certain but very limited legal sense, it was a trust and the fund a trust fund, but not differing from other trusts that may be said to be imposed upon counties and county officials by legislative direction relating to other matters of local government and local administration.

Under the code provisions, the county treasurer must now, as he was under all laws required to do, forward monthly reports of all moneys received for sales of all state lands; at the end of each quarter he must report to the controller "the sum which has been received from each class of land"; these reports must be examined and certified to be correct by the register, whereupon the county treasurer must make his settlement with the controller and pay over all moneys, etc., except he "must retain all moneys arising from the sale of swamp and overflowed lands and place the same to the credit of a fund known as the 'swamp land fund' of the county." (Pol. Code, secs. 3422-3426.) Examination of section 3474, and the following sections, will show that, while the reclamation is carried on immediately under supervision of the boards of supervisors, reports of the work must be made to the register, and it is through this officer credit is given to the purchaser for his payments made. The county official machinery and county officials, as agencies of the state, have been and are being used in carrying out the original purpose in the mind of Congress. (*Edwards v. Estell*, 48 Cal. 194.) There is nowhere to be found in any of the various acts relating to these lands any legislative donation of this fund or grant in trust or otherwise as claimed by appellant. The state has done no more than to call to its aid, in administering the congressional grant, the various counties where the land is situated, and the state may alter or amend any of its laws relating to the subject, and may reclaim the custody of the fund not already disposed of under the law at its pleasure. (*Kimball v. Reclamation Fund Com.*, 45 Cal. 344.) When Kings county was organized, the fund was in the custody of the proper officials of Tulare county, and the only debatable question here is: Did the act creating Kings county transfer or has any act authorized the transfer of this fund to Kings county?

Section 15 of the act creating Kings county authorized it to collect unpaid taxes assessed upon lands within its boundaries.

Section 16 authorized it to receive and Tulare county to pay over the proportion of the school fund to which it was entitled, and also its share of the road fund.

There was no provision for the transfer or payment to Kings county of any other fund or part thereof. There is no mention

made of the swamp land fund and nothing in the act to justify us in holding, as is claimed by appellant, that "the act removed Tulare county as trustee of the fund sued for."

On March 23, 1893, the day following the Kings county act, an act was passed (Stats. 1893, p. 235) entitled "An act to transfer certain moneys from one county to another, when a new county has been formed and organized." By this act a transfer was directed of all moneys standing to the credit of any road or school district, "the territory comprising which has been segregated from such old county, and which is included in the boundaries of such new county."

Section 4 of the act provided as follows: "A compliance with the provisions of this act shall be a full and complete settlement of all demands which the new county had against the old county or counties."

We have been unable to find any general law or special act, and none has been pointed out, giving express authority for transferring this fund. We do not think the authority can be derived from the general laws relating to the fund. They do not seem to have contemplated the division of counties and the possible shifting of reclamation districts in whole or in part from one county to another. It is true that the law as it now stands would seem to compel owners of swamp lands situated in Kings county to go to Tulare county to have the business of their reclamation districts settled and adjusted, while literally the law directs them to go to the officers of their own county who are impotent to aid them.

It may be that to preserve the harmony of the system this fund now in the custody of Tulare county, so far as it has been derived from lands situated within the present boundaries of Kings county, should be transferred to the latter county. To do this some adjustment of accounts between reclamation districts would be necessary because of the interlapping of present boundaries of districts so as to leave parts of the lands of a district in both counties. There is no allegation in the complaint that the lands claimed to be swamp and overflowed lands now situated in Kings county form one or more reclamation districts separate from any district existing in Tulare county. The inference to be drawn from the complaint is, that the reclamation districts now existing embrace lands in both counties. We

think the whole subject is one exclusively with the legislature, and is not one of judicial cognizance, in the absence of express legislative authority given to the courts to take jurisdiction of it.

We do not think the complaint presents the case of a trust about to fail for want of a trustee, as appellant claims; nor does there appear to be any ground for equitable interposition. The legislature is the appropriate and only source of relief. (See *Tulare County v. Kings County,* 117 Cal. 195; and cases there cited, for a discussion of the general principle governing the disposition of property upon the division of a county.)

We think that the demurrer was properly sustained, and therefore recommend that the judgment be affirmed.

Belcher, C., and Haynes, C., concurred.

For the reasons given in the foregoing opinion the judgment is affirmed.

McFarland, J., Henshaw, J., Temple, J.