Argued April 4, reversed May 29, 1963

# SUBURBAN PROPERTIES, INC. *v.* HANSON ET UX

382 P. 2d 90

*Roger N. Rook,* Milwaukie, argued the cause for appellants. On the brief were Erlandson & Rook.

*George A. Haslett, Jr.,* Portland, argued the cause for respondent. With him on the brief was Robert J. Johnston.

Before MCALLISTER, Chief Justice, and PERRY, O'CONNELL, DENECKE and LUSK, Justices.

LUSK, J.

This is a suit in equity to cancel a deed of conveyance of real property. The circuit court entered find-

ings of fact, conclusions of law, and a decree for the plaintiff and the defendants have appealed.

During the pertinent times, the plaintiff was the owner of real property in Washington county, Oregon, which it was engaged in developing for residence purposes. The defendants are Howard Hanson, a builder and contractor, and his wife. Mr. Hanson acted as agent for his wife throughout the transaction in question and he will be hereinafter referred to as the defendant.

The dispute arose out of a sale in November, 1960, by the plaintiff to the defendant of two parcels of land referred to in the record as lot A and lot B in a subdivision known as "Harvest Hill." The agreed purchase price of each lot was $2,300 and, as to each lot, the defendant gave to the plaintiff two promissory notes, one for $1,000 payable on demand, the other for $1,300, payable six months after date. Defendant further agreed to build a house on each lot, and that as to each lot the $1,000 note should be paid out of the first moneys received by the defendant from a building loan to be obtained by him and that the $1,300 note should be paid when the house built on such lot should be sold. The reason why the notes were split up in this manner was that the lots were part of a tract which plaintiff was buying on contract, which provided that upon each $1,000 payment, a lot would be released from such contract. To clear the title to the lots here involved and thus enable the defendant to get his building loan, plaintiff made payment of $2,000 on its contract of purchase. Payment of the $1,000 notes by the defendant would reimburse plaintiff for this outlay.

Deeds to both lots were delivered by the plaintiff to the defendant. No mortgage or other security was

given by the defendant. The present controversy relates only to lot B and arises out of the failure of the defendant to build a house on that lot. The court found that this failure constituted a breach of the contract and warranted the remedy of cancelation. We agree that the defendant did breach the contract in the particular stated, but are of the opinion that the court erred in decreeing cancelation of the deed.

A principal contention of the plaintiff in support of the decree is that delivery of title to lot B was never made to the defendant.

The evidence bearing upon this question is as follows: Under date of November 1, 1960, the parties entered into a written agreement on a printed form styled an "earnest money receipt", for the sale and purchase of the two lots, in which the plaintiff acknowledged the receipt of $4,600 from the defendant "as part payment" for the purchase thereof. The plaintiff was represented in the transaction by Francis DeHarpport, sales manager for Key Investment Company, which was the administrative agent of the plaintiff. The agreement recites that the plaintiff had sold the property on that day to the defendant for the sum of $4,600 and that possession was to be delivered "at once," words written in by Mr. DeHarpport. The four notes representing the purchase price were executed and delivered on the same day. On each of the $1,000 notes DeHarpport wrote "to be paid out of 1st disbursement", that is of the loan on the applicable lot; and on each of the $1,300 notes he wrote: "To be paid when [house designated] is sold". DeHarpport testified that he explained to the defendant and the latter agreed that "the other $1,300 he was to pay as soon as the house was sold or on or before six months." Defendant agreed in his testimony that this was the

understanding. All the notes bore interest at the rate of six and one-half per cent per annum from date until paid.

The deeds appear to have been prepared later— the deed to lot A is dated November 30, 1960, and was recorded on January 11, 1961; that to lot B is dated November 21, 1960, and was recorded on September 20, 1961. They are general warranty deeds, with the usual covenants and each expressing a consideration of $10 and other good and valuable considerations. Mr. DeHarpport testified that he agreed to give the defendant the deed to lot A at once because he needed that deed in order to obtain his mortgage, but that the defendant was to be given the deed to lot B when he was ready to start the second house. The defendant was unable to state the exact date when he received either deed. The description of the property in the deed to lot B (whenever it may have been originally prepared and delivered) had to be corrected so as to decrease the size of the lot in order to meet the requirements of Washington county in connection with the obtaining of a building permit. This alteration was made in the office of Key Investment Company. The defendant testified that Mr. Ray Mills, a member of the staff of Key Investment Company who did most of the purchasing for the plaintiff, decided upon the alteration, and that it was typed in defendant's presence by Al Johnston, office manager of Key Investment Company, and that the corrected deed was then handed to him either by Mr. Johnston or by Mr. Mills. The defendant could not remember the date of this occurrence, but thought it could not have been more than a week or two after the deed was dated, that is, November 21, 1960. Mr. Johnston testified to making the alteration on the typewriter under the

direction of Mr. Mills, who, he said, was familiar with the problem involved. Johnston had no other connection with the matter, though he was present when the defendant came into the office and talked to Mills about the difficulty he was having on account of the size of the lot as described in the deed as it was originally drawn. Mr. Johnston testified that after the correction was made he either handed the deed to Mr. Mills or placed it in front of him; he did not know whether after that Mills handed it to the defendant.

Mr. Mills was not called as a witness by the plaintiff and the record contains no explanation of the failure to call him.

As authorities cited by the plaintiff show, the question of delivery is a question of fact rather than law, depending upon the intent of the grantor to vest an estate in the grantee, *Lancaster v. May, as Administrator,* 194 Or 647, 655, 243 P2d 268; *Jobse v. U. S. Nat. Bank,* 142 Or 692, 696, 21 P2d 221. The evidence here establishes that the corrected deed to lot B was manually delivered to the defendant by a duly authorized agent of the plaintiff. That this was done with the intention to vest title in the defendant is the only reasonable inference. "The least questionable proof [of delivery] is a manual transfer of the instrument by the grantor to the grantee, requiring strong evidence to overcome it." III American Law of Property 312-313, Deeds § 12.64. The deed was executed in pursuance of a previous understanding with the defendant and was beneficial to him and therefore his acceptance is presumed, *Lancaster v. May,* supra; III American Law of Property 333. It is true that the deed was not recorded until several months later, but recording was not necessary for the validity of the instrument as between the parties. An important fact

is that without title to the property the defendant would be unable to obtain the loan which both parties contemplated. Defendant was obligated to pay interest on the purchase price from the date of the agreement, November 1, 1960. In these circumstances, it would be unreasonable to conclude that the grantor lacked an intention to transfer title to the property or that the grantee did not accept it.

Counsel for the plaintiff at the trial practically conceded failure of proof on this issue when he stated to the court at the conclusion of the testimony:

"I am inclined to believe that the evidence produced by the plaintiff in regard to the non-delivery is not as substantial as it should be to sustain that purpose. I think it most probably shows a mistake and a lack of knowledge that the deed had been delivered. Therefore, I would not insist or request that the Court consider that as the primary basis for the cancellation in this case."

The court found that the evidence did not support the claim of non-delivery and with its finding we agree.

The next question is whether, under established rules in this class of cases, the plaintiff is entitled to the remedy of cancelation, or whether it must resort to its remedy at law in an action on the notes and for damages, if any have been suffered.

■ This is a case in which there was a fully executed sale of land by the plaintiff to the defendant accompanied by a covenant on the part of the defendant to build a house on the land and pay the plaintiff two promissory notes given for the purchase price, one out of a building loan to be obtained by the defendant, the other when the house should be sold. The parties did not agree, however, that the loan and the proceeds of the sale of the contemplated house were to be the

exclusive source of payment of the notes. Were that the case, we would have a different lawsuit. On the contrary, the defendant was legally bound to pay the principal and interest of these notes, one on demand, the other in six months, whether or not a loan was obtained or a house built and sold. Doubtless, one purpose of the agreement was to enable the defendant to make a profit out of the sale of the projected houses and another was to provide the defendant with the means of securing the funds for payment of the notes to the plaintiff, but neither of these facts in any way alters the unconditional character of the defendant's obligation.

If the house had been built as agreed, it would have been, together with the ground upon which it was built, the property of the defendant. All that plaintiff would have been entitled to in that case was payment of the notes. The question here is whether the different and drastic relief of cancelation of the deed is available to the plaintiff because of defendant's failure to build the house in accordance with his agreement. It is to be borne in mind that there was no fraud or mistake or confidential relationship or other similar ground of equitable jurisdiction, and there is no pleading or proof that the defendant is insolvent.

As authority for the claimed right, plaintiff cites *Krebs Hop Co. v. Livesley,* 51 Or 527, 92 P 1084, where the court enunciated the rule regarding the right of one party to an *executory* contract to rescind for some failure on the part of the other party. "To justify such a course of procedure" it was said "there must be a failure in some substantial particular, which goes to the essence of the contract, and renders the defaulting party incapable of performance, or makes it impossible for him to carry out the contract as

intended." 51 Or at 533. That case involved a contract for the sale of hops extending over a period of five years. The ground of the suit was that the plaintiff (the seller) had assigned the contract to a bank. The court said:

> "In order, therefore, to justify defendants' attempted abandonment or rescission of the contract between them and plaintiff, it is incumbent upon them to show that plaintiff has rendered itself incapable of performance." 51 Or at 534.

As the proof of the defendants did not meet this test the remedy of rescission was held to be not available.

The distinction of first importance between this and the *Krebs* case is that the contract in the latter was wholly executory, while here it is fully executed except for defendant's agreement to construct a building on lot B. As this court said (quoting from 6 Cyc 336) in *DeYulio et ux. v. Brownell et ux.*, 107 Or 651, 657, 215 P 576:

> "* * * 'The cancellation of an executed contract is an exertion of the most extraordinary power of a court of equity, which ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear.' * * *"

The distinction in this regard between an executory and an executed contract was pointed out in *McMillan v. Am. Suburban Corp.*, 136 Tenn 53, 59, 188 SW 615, 617, LRA 1917B 401, 403, in this language:

> "As has been well said, the power of a court of equity to decree the rescission of an executed contract and order its surrender for cancellation is one of the most delicate powers it is ever called upon to exercise. The equitable remedy of rescission is not one enforceable as a matter of right, and

the court should not award it in [a] case where some such element as actual fraud, accident, mistake or insolvency does not appear to justify it. This is true even though the circumstances are such that were the contract still executory, the court would grant that relief. The vendee is left to resort to his legal remedy for damages for the breach."

In that case a vendee in possession under an executed contract who sued for rescission because of breach of the vendor's agreement to lay water pipe lines to the property was held to be limited to his legal remedy, there being no claim of fraud or mistake or that the vendor was insolvent. The court indicated, however, that had the contract been executory, there would have been a different decision.

A similar case was *Emigrant Co. v. County of Adams*, 100 US 61, 70-71, 25 L Ed 563, where the court said:

"The allegations of the bill to the effect that the Emigrant Company has not fulfilled its engagements with respect to the drainage and settlement of the land, rest in covenant merely, and afford no ground for avoiding the contract. Where covenants are mutual and dependent, the failure of one party to perform absolves the other, and authorizes him to rescind the contract. But here the contract was largely carried into execution soon after its inception. The engagements of the appellants to introduce settlers and the like were to be performed in the future; and their performance was not made a condition, but, as before stated, rested in covenant. In case of a breach, they would lay the foundation of an action, but nothing more."

See, also, *Crampton v. McLaughlin Realty Co.*, 51 Wash 525, 99 P 586, 21 LRA NS 823; 8 Thompson, Real Property (perm ed) 575, § 4607; 12 CJS 982,

Cancellation of Instruments § 29; 9 Am Jur 374, Cancelation of Instruments § 29.

It has not been suggested by the plaintiff, and it could not be successfully maintained, that the defendant's undertaking to build the two houses was a condition subsequent upon the breach of which restoration of the status quo could be decreed. The law with respect to the subject is thus stated in 5 Pomeroy's Equity Jurisprudence (2d ed) 4755, § 2108:

> "It is, of course, the general rule that the mere failure by a grantee to perform a promise, which formed the whole or part of the consideration inducing an executed conveyance, gives rise to no right of rescission in the grantor, either at law or in equity, unless such promise amounts to a condition; and it is a rule of construction that, in case the language or intention is doubtful, 'the promise or obligation of the grantee will be construed to be a covenant, limiting the grantor to an action thereon, and not a condition subsequent, with the right to defeat the conveyance.' "

See *Hewett v. Dole,* 69 Wash 163, 124 P 374; *Lawrence v. Gayetty,* 78 Cal 126, 133-135, 20 P 382, 12 Am St Rep 29, where the foregoing principle is stated and applied.

There was, of course, no express agreement making defendant's promise a condition and there is nothing in the evidence pertaining to this loose oral arrangement which would justify a court in so construing it. There is no evidence that plaintiff has sustained any damages by reason of defendant's breach that are not capable of reasonable ascertainment or, for that matter, that it has been damaged at all. If it should be said that plaintiff has suffered because of delay it could be answered that defendant must com-

pensate for this delay by the payment of interest. So far as this record reveals, plaintiff has an adequate remedy at law by an action on the notes.

■ Counsel for plaintiff argue that defendant is estopped from claiming any rights under the original agreement because he stood by, without objection, while plaintiff commenced building a house on lot B. The facts material to this contention are as follows: About September 15, 1961, the plaintiff went into possession of lot B and commenced construction of a house on it. Before doing so it obtained a report from a title company that the title to the lot was in its name. The defendant was away from his home on vacation from September seventh to seventeenth. On his return he learned that a man named Olds, who was acting for the plaintiff, had left word at defendant's home for defendant to remove his construction forms from lot B so that Olds could build on it. Hanson went to the property and saw that construction had commenced and in order to "find out where I stood" consulted an attorney, following which, on September 20, he recorded the deed to lot B.

We see no element of estoppel in these facts so far as the issues of the present case are concerned. Since the plaintiff had no legal right to take possession of lot B, it did so at its peril. Whether in future litigation, should there be any, arising out of the erection of a structure by one person on another's land (see *Jensen v. Probert,* 174 Or 143, 148 P2d 248), defendant's seeming acquiescence in the face of knowledge of what was going on would be a relevant factor, is a question not now pertinent and concerning which we neither express nor intimate an opinion.

■ Finally, the plaintiff urges that late in September, 1961, the parties agreed upon a compromise

settlement of their controversy which the defendant wrongfully refused to go through with. It appears that defendant had found a purchaser for the dwelling house on lot A and that plaintiff rendered some service in financing the purchaser so that the defendant would receive cash in payment of the purchase price. Plaintiff's testimony is to the effect that the consideration for this service was defendant's promise to give plaintiff a quitclaim deed to lot B. Defendant denied this. The trial court made no finding upon this issue. Evidently, there was discussion of the matter between the parties and it is a fact that defendant was handed a quitclaim deed to lot B and asked to sign it, but he refused. The evidence is not convincing that there was a meeting of the minds upon the alleged agreement.

The decree is reversed and the suit dismissed. No costs or disbursements will be allowed.