## UNITED STATES *v.* LOUISIANA.

### APPEAL FROM THE COURT OF CLAIMS.

No. 1388.   Submitted April 2, 1888. — Decided April 23, 1888.

A claim by the State of Louisiana to 5 per cent of the net proceeds of the sales of the lands of the United States, under § 5 of the act of February 20, 1811, c. 21, 2 Stat. 641, and a claim by the same State to the proceeds of the sale by the United States of swamp lands, growing out of the provisions of the acts of September 28, 1850, c. 84, 9 Stat. 519, and March 2, 1855, c. 147, 10 Stat. 634, are claims against which the United States can set off the amount due to them by the State on matured coupons on bonds known as the Indian Trust bonds, issued by the State.

Under § 1069 of the Revised Statutes, the Court of Claims had no jurisdiction of so much of the claim to the 5 per cent fund as was credited to the State on the books of the Treasury Department more than six years before the bringing of the suit

THE case is stated in the opinion of the court.

*Mr. Attorney General* and *Mr. Heber J. May* for appellant.

*Mr. William E. Earle* and *Mr. James L. Pugh, Jr.* for appellee.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is an appeal by the United States from a judgment of the Court of Claims, awarding to the State of Louisiana the sum of $43,572.71.

There are claims of two kinds involved in the suit. The first claim arises under the act of February 20, 1811, c. 21, 2 Stat. 641, which authorized the inhabitants of Louisiana to form a constitution and a state government. The 5th section of that act provided as follows: "That five per centum of the net proceeds of the sales of the lands of the United States, after the first day of January, shall be applied to laying out and constructing public roads and levees in the said State, as the legislature thereof may direct."

The second claim arises under §§ 1, 2, and 4 of the act

of September 28, 1850, c. 84, 9 Stat. 519, and §§ 1 and 2 of the act of March 2, 1855, c. 147, 10 Stat. 634. Sections 1, 2, and 4 of the act of 1850 read as follows: "That, to enable the State of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands, made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be, and the same are hereby granted to said State. SEC. 2. That it shall be the duty of the Secretary of the Interior, as soon as may be practicable after the passage of this act, to make out an accurate list and plats of the land described as aforesaid and transmit the same to the governor of the State of Arkansas, and, at the request of said governor, cause a patent to be issued to the State therefor; and on that patent, the fee-simple to said lands shall vest in the said State of Arkansas, subject to the disposal of the legislature thereof: *Provided, however*, that the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid." "SEC. 4. That the provisions of this act be extended to, and their benefits be conferred upon, each of the other States of the Union in which such swamp and overflowed lands, known and designated as aforesaid, may be situated." Section 1 of the act of 1855 provided that the President should cause patents to be issued to purchasers or locators who had made entries of public lands claimed as swamp lands, prior to the issue of patents to the State, as provided for by § 2 of the act of 1850, except in certain specified cases. Section 2 of the same act provided as follows: "That upon due proof, by the authorized agent of the State or States, before the Commissioner of the General Land Office, that any of the lands purchased were swamp lands, within the true intent and meaning of the act aforesaid, the purchase money shall be paid over to the said State or States."

The State alleged, in its petitions in the Court of Claims, (for there were two suits, which were consolidated,) that the moneys due to it under the act of 1811, instead of being paid

over to it by the United States, had been unlawfully credited
upon certain bonds alleged to have been issued by the State,
and claimed to be held by the United States as an investment
of certain Indian Trust funds; that, as to the acts of 1850 and
1855, moneys were due to the State thereunder, which had
been legally ascertained and certified, but, instead of being
paid over to the State, had been credited on bonds of the
same kind; and that the sums referred to as being ascertained
and found due to the State were trust funds, to be devoted to
specific purposes, under the provisions of the acts granting
them to the State.

The United States, in addition to a general traverse, put in
a special plea of set-off, alleging that the State was indebted
to the United States in the amount of interest which had ac-
crued on bonds issued by the State and held by the United
States.

The Court of Claims found as facts (1) that, of the 5 per
cent fund accruing to the State under the act of 1811, there
remains due from the United States to the State, as credited
on the books of the Treasury Department, the following sums:
May 8, 1879, $13,602.71; June 8, 1882, $63.47; February 7,
1884, $22,773.51; making a total of $36,439.69; and that, of
the swamp-land fund accruing to the State under the acts of
1850 and 1855, there remains due from the United States to
the State, as credited on the books of the Treasury Depart-
ment, the following sums: May 26, 1886, $3803.02; Septem-
ber 9, 1886, $1110.00; May 2, 1887, $1730.41; May 4, 1887,
$489.59; making a total of $7133.02; (2) that the First
Comptroller of the Treasury, at the dates stated in finding 1,
admitted and certified the above sums to be due to the State
on account of the 5 per cent fund and the indemnity for
swamp lands purchased by individuals within the State, but
directed those amounts to be credited on moneys due the
United States, as stated in finding 3; and that it does not
appear that the state authorities had knowledge of this pro-
ceeding; (3) that the United States own coupon bonds issued
by the State, amounting to $37,000, payable in 1894, known
as the Indian Trust bonds, and also hold and own overdue

coupons attached to those bonds, representing the interest from May 1, 1874, to November 1, 1887, amounting to $31,080. The court gave a judgment in favor of the claimant for the total of the two amounts of $36,439.69 and $7133.02, namely, $43,572.71.

The contention of the United States in the Court of Claims was that, under § 1069 of the Revised Statutes, which pro-vides that every claim against the United States, cognizable by that court, shall be forever barred unless the petition setting forth a statement thereof is filed in the court within six years after the claim first accrues, the court had no juris-diction in respect to the sum of $13,602.71, credited on the books of the Treasury Department on the 8th of May, 1879, as a part of the 5 per cent fund, because the first of the two petitions was not filed until February 1, 1887. Deducting this sum of $13,602.71 from the $43,572.71, would leave the sum of $29,970; and it was contended by the United States that the claim for this sum was more than covered by the set-off of the $31,080, due by the State on the coupons on the Indian Trust bonds.

The Court of Claims held that the two funds in question, in the treasury of the United States, were trust moneys, to be held for special purposes, at first by the United States, and by the State after a transfer to it; that the trust had not been disavowed or annulled by Congress; that it became the duty of the executive officers of the United States, in charge of the funds, to hand them over to the State as a succeeding trustee; that the credit given to the State in the Treasury Department, on its indebtedness to the United States, for the amount of the coupons on the Indian Trust bonds, was without authority of law; that, consequently, the funds were free from liability to the set-off; and that the claim of the State to the $13,602.71 was not barred by § 1069 of the Revised Statutes.

The provisions of the swamp-land act of 1850 have been before this court in several cases. In *Emigrant Co.* v. *County of Wright,* 97 U. S. 339, at October Term, 1877, the State of Iowa had, by statute, granted the swamp lands to the counties of the State in which they might be found, with an injunction

that the lands and their proceeds should be appropriated to reclaiming the swamp lands; and if, when this was accomplished, anything was left, to building roads and bridges over the same; and lastly, the remainder to be used in building roads and bridges in other parts of the county. By subsequent legislation of the State, the counties were authorized to depart from this injunction, and to use the lands for public buildings and internal improvements; but the assent of the majority of the voters of the county to such purpose was required. The State also authorized the sale of all the lands to any person or corporation by a written contract, to be in like manner submitted to the vote of the county; but the sale was to be subject to the proviso that the vendee should take the lands subject to all the provisions of the act of Congress of 1850. Wright County, with the assent of a majority of the voters of the county, having contracted in writing with the Emigrant Company to sell to it all the swamp lands in the county, and the claim of the county for indemnity against the United States for swamp lands which had been sold by the United States, and having executed a deed of a quantity of the lands to the company, the county filed a bill in equity to set aside the contract and deed, and obtained a decree to that effect in the Circuit Court. In the opinion of this court, delivered by Mr. Justice Miller, the proposition urged by the plaintiff in the suit was considered, namely, that the contract was void on its face, because it contemplated a diversion of the fund in violation of the original grant. As regarded that proposition, the court said: "It is not necessary to decide it in this case, and we do not decide that the contract is, for that reason alone, void. But we are of opinion that any purchaser of these lands from the county, or of the claim of the county to indemnity, must be held to know that in the hands of the county they were impressed with an important public trust, and that, in examining into the fairness and honesty of such a purchase, this consideration constitutes an important element of the decision." The court then proceeded, in its opinion, to hold that the contract must be rescinded, because of what amounted to fraud in the manner in which it was

procured, namely, that the officers and citizens of the county were ignorant of the nature and value of what they were selling ; that the vendee was well informed in regard to both, and withheld such information unfairly from the officers of the county; and that there was a provision in the contract "for a diversion of the fund to other purposes, a gross inadequacy of consideration, and a successful speculation at the expense of the rights of the public."

Questions arising under the same act of Congress, of 1850, and the same legislation of Iowa, came before this court again, at October Term, 1879, in *Emigrant Co.* v. *County of Adams,* 100 U. S. 61. In that case the county of Adams had made a contract with the Emigrant Company to convey to it the county's swamp lands and claim for indemnity against the United States on account of swamp lands which had been sold by the United States, and had given a deed in pursuance of the contract. It afterwards filed a bill to rescind the contract and the deed, and obtained in the Circuit Court a decree to that effect, which this court reversed. The case was twice argued here. In the opinion of the court, delivered by Mr. Justice Bradley, it was stated that there was no sufficient proof that the contract was procured by false and fraudulent representations. It was also said, of the act of 1850, that by it the lands "were granted to the several States in which they lie for a purpose expressed on the face of the act; and that purpose was 'to enable the State to construct the necessary levees and drains to reclaim them.'" The opinion added: "Our first view was, that this trust was so explicit and controlling as to invalidate the scheme finally devised by the legislature of Iowa for the disposal of the land, and under which the contract in question was made. But, on more mature reflection, after hearing additional argument, we are satisfied that such a result did not necessarily follow." The opinion then referred to the act passed by the legislature of Iowa in 1858, by which it was declared that it should be competent and lawful for the counties owning swamp and overflowed lands to devote the same, or the proceeds thereof, either in whole or in part, to the erection of public buildings for the

purpose of education, for the building of bridges, roads, and highways, and for building institutions of learning, or for making railroads through the county or counties to which such lands belonged. The opinion then proceeded: "The contract in dispute was made under this law, and our first impression was that it introduced a scheme subversive of the trust imposed upon the State by the act of Congress; that its effect was to devote the lands and proceeds thereof to purposes different from those which the original grant was intended to secure; that it threw off, or endeavored to throw off, all public responsibility in relation to the trust; and hence that the scheme itself and the contract based upon it were void. But a reconsideration of the subject has brought us to a contrary conclusion. The argument against the validity of the scheme is, that it effects a diversion of the proceeds of the lands from the objects and purposes of the congressional grant. These were declared to be to enable the State to reclaim the lands by means of levees and drains. The proviso of the second section of the act of Congress declared that the proceeds of the lands, whether from sale or direct appropriation in kind, should be applied exclusively, as far as necessary, to these purposes. This language implies that the State was to have the full power of disposition of the lands; and only gives direction as to the application of the proceeds, and of this application only ' as far as necessary ' to secure the object specified. It is very questionable whether the security for the application of the proceeds thus pointed out does not rest upon the good faith of the State, and whether the State may not exercise its discretion in that behalf without being liable to be called to account, and without affecting the titles to the lands disposed of. At all events, it would seem that Congress alone has the power to enforce the conditions of the grant, either by a revocation thereof, or other suitable action, in a clear case of violation of the conditions. And, as the application of the proceeds to the named objects is only prescribed ' as far as necessary,' room is left for the exercise by the State of a large discretion as to the extent of the necessity. In the present case it is not shown by allegations in the bill, or other-

wise, (if such a showing would be admissible,) that any necessity existed for devoting the proceeds of the lands in question to the purposes of drainage. No case is shown as the basis of any complaint, even on the part of the general government, much less on the part of the county of Adams, which voluntarily entered into the arrangement complained of. Our conclusion, therefore, is that this objection to the validity of the contract cannot prevail." The opinion then overruled the other grounds urged in favor of the plaintiff, reversed the decree below, and directed a decree to be entered dismissing the bill, without prejudice to the right of the county to bring an action at law for any breach of the terms of the contract.

The provisions of the swamp land act of 1850, and of the Iowa statutes in regard to the swamp lands, were again considered by this court in *Mills County* v. *Railroad Companies*, 107 U. S. 557, at October Term, 1882, the opinion of the court being delivered by Mr. Justice Bradley. In that case, reference was made to *Emigrant Co.* v. *County of Wright*, *supra*, and it was said that the contract there "was declared to be void for actual fraud of the grossest character," and that the question as to whether the disposition of the lands operated as a diversion of the fund, in violation of the original grant, was not fully considered. The opinion also referred to the case of *Emigrant Co.* v. *County of Adams*, *supra*, and quoted a large part of the extract above given from the opinion in that case, and then added: "Upon further consideration of the whole subject, we are convinced that the suggestion then made, that the application of the proceeds of these lands to the purposes of the grant rests upon the good faith of the State, and that the State may exercise its discretion as to the disposal of them, is the only correct view. It is a matter between two sovereign powers, and one which private parties cannot bring into discussion. Swamp and overflowed lands are of little value to the government of the United States, whose principal interest in them is to dispose of them for purposes of revenue ; whereas, the state governments, being concerned in their settlement and improvement, in the opening up of roads and other public works through them, in the pro-

motion of the public health by systems of drainage and embankment, are far more deeply interested in having the disposal and management of them. For these reasons, it was a wise measure on the part of Congress to cede these lands to the States in which they lay, subject to the disposal of their respective legislatures; and, although it is specially provided that the proceeds of such lands shall be applied, 'as far as necessary,' to their reclamation by means of levees and drains, this is a duty which was imposed upon and assumed by the States alone, when they accepted the grant; and whether faithfully performed or not is a question between the United States and the States; and is neither a trust following the lands nor a duty which private parties can enforce as against the State."

These views were confirmed in the case of *Hagar* v. *Reclamation District*, 111 U. S., 701, 713, at October Term, 1883, where it was said of the swamp-land act of 1850, that the appropriation of the proceeds of the sale of the lands rested solely in the good faith of the State; and that its discretion in disposing of them was not controlled by the condition mentioned in the act, as neither a contract nor a trust following the lands was thereby created.

In the case of *Louisiana* v. *United States*, 22 C. Cl. 284, the State of Louisiana sued the United States for claims arising under the 5 per cent act of 1811, and under the swamp-land acts of 1850 and 1855, and had a judgment for both claims, amounting to $71,385.83, which was affirmed by this court in *United States* v. *Louisiana*, 123 U. S. 32. In that case, the United States interposed the defence of the limitation of six years, as to the swamp-land claim. The Court of Claims held that the action of the Commissioner of the General Land Office, under § 2 of the act of 1855, in determining, on proof by the agent of the State, that any of the swamp land had, within the meaning of the act, been sold by the United States, so as to bring into force the requirement that the purchase money should be paid over to the State, was necessary to a right of action for the money on the part of the State, and that, as such action in that case did not occur more than

six years before the bringing of the suit, the limitation prescribed by § 1069 of the Revised Statutes did not apply. A set-off or counter-claim was interposed in that case by the United States, they alleging that the amount due by citizens of the State of Louisiana to the United States for the direct tax levied by the act of August 5, 1861, 12 Stat. 292, was a proper subject of set-off against the claim of the State in the suit. This contention of the United States was overruled by the Court of Claims, on the ground that the State had never assumed the payment of the tax assessed under the act of 1861. On the appeal to this court by the United States, 123 U. S. 32, it was said in the opinion of the court delivered by Mr. Justice Field, that the statute of limitations did not seem to have any application to the demand arising upon the swamp-land acts; and that, as the Commissioner of the General Land Office had not found and certified the amount due to the State from the sales of swamp lands until the 30th of June, 1885, and the suit was commenced in September, 1886, the limitation of the statute did not apply to the case. It was further held, that the State was not liable for the taxes assessed under the act of August 5, 1861, against the real property of private individuals in the State, and that the Court of Claims had jurisdiction of the action. Therefore, the judgment was affirmed.

In accordance with the views of this court in the cases above cited, it must be held that the proceeds of the swamp lands are not subject to a property trust, either in the hands of the United States or in those of the State, in such sense that the claim of the United States upon the State for the overdue coupons on the Indian Trust bonds, involved in the present case, cannot be set-off against the claim of the State to the swamp-land fund.

Under the act of 1850, the swamp lands are to be conveyed to the State as an absolute gift, with a direction that their proceeds shall be applied exclusively, as far as necessary, to the purpose of reclaiming the lands. The judgment of the State as to the necessity is paramount, and any application of the proceeds by the State to any other object is to be taken as

the declaration of its judgment that the application of the proceeds to the reclamation of the lands is not necessary. By the 2d section of the act of 1855, it is provided that the purchase money received by the United States for the swamp lands sold by them shall be paid over to the State. There is nothing in these provisions of the character of a property trust, and nothing to prevent the application by the State of the swamp-land fund to general purposes. If the power exists anywhere to enforce any provisions attached to the grant, it resides in Congress and not in the court.

The same views apply to the provision as to the 5 per cent fund, in the act of 1811, that it shall be applied to laying out and constructing public roads and levees in the State, "as the legislature thereof may direct;" and as to both the 5 per cent fund and the swamp-land fund, we are of opinion that neither of them is of such a character that the debt due to the United States by the State of Louisiana, for the overdue coupons on the Indian Trust bonds, cannot be set off against the fund which is in the hands of the United States. This being so, it follows that the limitation of § 1069 of the Revised Statutes is a bar against the recovery of the item of $13,602.71 of the 5 per cent fund, credited May 8, 1879, and that the amount of the set-off of $31,080, for coupons falling due up to November 1, 1887, on the Indian Trust bonds, is a valid set-off against the remaining $29,970, and is more than sufficient to extinguish that item.

It results from these views that

*The judgment of the Court of Claims must be reversed, and the case be remanded to that court, with a direction to enter a judgment in favor of the United States.*