[No. 3186.  Jan. 30, 1928.]

REGENTS OF UNIVERSITY OF NEW MEXICO v.
GRAHAM, State Treasurer, et al.

[264 Pac. 953.]

Downer, & Keleher, of Albuquerque, for appellant.

R. C. Dow, Atty. Gen., Summers Burkhart, of Albuquerque, and W. A. Gillenwater, of Clovis, for appellees.

## OPINION OF THE COURT

PARKER, C. J.  The University of New Mexico seeks, by mandamus, to compel the state treasurer, the state auditor, and the commissioner of public lands to place in its income fund the oil royalties from certain lands, the title to which is in the state, for the University's use and benefit.  The defense is that in law such oil royalties belong in the University's permanent fund.  The trial court dismissed the writ, and the University appealed.

Laws 1917, c. 115, § 2, provides:

"The permanent funds created by this act shall consist of the proceeds of sales of lands belonging thereto that may have been or may hereafter be granted to the state, not otherwise appropriated by the terms and conditions of the grant, and such other moneys as may be specifically provided by law, and the income and current funds created by this act shall consist of rentals, sale of products from lands, interest on permanent funds, and anything

else other than money directly derived from sale of all state lands so granted, the income derived from the investment of the permanent funds herein created, such other moneys as may be specifically provided by law, and miscellaneous income not provided for by this act."

Appellees do not question that, if this section is valid, the University's contention is correct. But, considering, as they here contend, that said section is violative of the terms of the trust, and void, they have, since June 8, 1925, placed the oil royalties in the permanent fund. Thereby the University has been allowed, for current use, only the interest therefrom. The broad question is this: Was it competent for the Legislature to direct the placing of oil royalties in the income fund?

The lands here involved are of the 65,000 acres granted the then territory by Act of Congress of June 21, 1898 (30 Stat. 484), commonly known as the Ferguson Act. This particular grant is found in section 3 of that act, which reads as follows:

"That lands to the extent of two townships in quantity, authorized by the sixth section of the Act of July twenty-second, eighteen hundred and fifty-four, to be reserved for the establishment of a University in New Mexico, are hereby granted to the territory of New Mexico for University purposes, to be held and used in accordance with the provisions in this section; and any portions of said lands that may not have been heretofore selected by said territory may be selected now by said territory. That in addition to the above, sixty-five thousand acres of nonmineral, unappropriated and unoccupied public land, to be selected and located as hereinafter provided, together with all saline lands in said territory, are hereby granted to the said territory for the use of said University, and one hundred thousand acres, to be in like manner selected, for the use of an Agricultural College. That the proceeds of the sale of said lands, or any portion thereof, shall constitute permanent funds, to be safely invested, and the income thereof to be used exclusively for the purposes of such University and Agricultural College, respectively."

By section 10 of the same act (30 Stat. 486) the public school and University lands were to be leased only. They could not be sold. The lease income was to "be placed to the credit of separate funds for the use of said institutions," and should be "paid out only as directed by the legislative assembly, * * * and for the purposes indicated herein." All other lands, including agricultural college lands, might be sold. Proceeds of sales should—

"be placed to the credit of separate funds created for the respective purposes named in this act and shall be used only as the legislative assembly * * * may direct, and only for the use of the institutions or purposes for which the respective grants of land are made."

They might also be leased, just as public school and University lands might be. Finally it was provided that "all investments made or securities purchased with the proceeds of sales or leases * * * provided for by this act shall be subject to * * * approval by the Secretary of the Interior."

By the Enabling Act (Act June 20, 1910, 36 Stat. pt. 1, p. 557) additional grants were made to the University and the Agricultural College, and by section 10 of the act the grants to those institutions contained in section 3 of the Ferguson Act were confirmed.

We have already taken occasion to examine the Enabling Act to determine whether it contemplated a permanent endowment for the Agricultural College. State v. Llewellyn, 23 N. M. 43, 167 P. 414. In that case we held that the Enabling Act did contemplate and require that all moneys derived from the lands granted to the Agricultural College, except ordinary rentals, should be placed and kept in a permanent fund, and that only the interest realized from such fund could be appropriated for current use. In that case we did not consider what rule would apply as to those lands granted by section 3 of the Ferguson Act. The case at bar is therefore distinguishable. Nevertheless, able counsel for the University admit that the holding in the Llewellyn Case stands as a bar to their contention here. They do urge, however, that it is dictum, is unsound, and should not be followed, all of which appellees deny. This is the principal difference between counsel, and we find it is decisive of this appeal.

Appellant's counsel attacks the reasoning of this court in the Llewellyn Case with vigor and ability. We need not set forth the argument here, because there is another situation, not noticed in the Llewellyn decision, which strongly reinforces the conclusion there arrived at, and answers most, if not all, of appellant's criticism. The in-

tention of Congress is not to be discovered from the Enabling Act alone. Behind it lay the Ferguson Act. The two are in pari materia. It had long been the practice of Congress to make various grants of lands to the states upon their admission to the Union, both by general and by special legislation. In the case of New Mexico, it was decided to give the territory, prior to its admission, the use and benefit of a part of the lands to which it would become entitled upon being admitted to statehood. With that end in view, the Ferguson Act was passed. The purpose was made plain by section 7 (30 Stat. 485), which provided:

"That this act is intended only as a partial grant of the lands to which said territory may be entitled upon its admission into the Union as a state, reserving the question as to the total amount of lands to be granted to said territory until the admission of said territory as a state shall be determined on by Congress."

When Congress deemed New Mexico ready for statehood, it took up the question reserved in the Ferguson Act, and then decided upon a number of supplemental and additional grants. Having enumerated them in section 7 of the Enabling Act, it adopted, in section 10, those provisions quoted in the Llewellyn Case, at page 63 of 23 N. M. (167 P. 414).

Appellant contends that there is nothing in those provisions of the Enabling Act fairly to indicate that Congress intended to restrict the right of the Legislature to adopt such policy as it might see fit with reference to the proceeds from the lands granted; that it was entirely competent for the Legislature to establish or not to establish an endowment, or, if it saw fit in the administration of the trust, to turn all money proceeds of said lands over to the University for current expenditure. It also contends that, if Congress did in fact contemplate a permanent fund, we were wrong in excluding even ordinary rentals from such requirement. The latter contention does not require consideration in this case. If we were to admit the former contention, as applied to the Enabling Act, standing alone, and as being a just criticism of the reasoning in the Llewellyn Case, we must still overrule it

when we consider the Ferguson Act as the background of the Enabling Act, and construe the two together.

It remains to state the reasons for this conclusion. Whether the territory could, under the Ferguson Act, have disposed of the oil content of University lands upon a royalty basis, need not be considered. It is admitted that, if the "permanent funds" provision of section 3 of the Ferguson Act remains in force, the proceeds of sales of University lands (now salable under the Enabling Act) constitute an endowment, and also that oil is a natural product, and oil royalties money proceeds of such land, belonging, under section 10 of the Enabling Act, in such endowment or permanent fund. The contention is that the "permanent funds" provision was wiped out by the Enabling Act.

As to former grants, the Enabling Act is confirmatory. This appears, not only by section 10, as quoted in the Llewellyn opinion, but by section 12 (36 Stat. 565), which provides:

"That all grants of lands heretofore made by any act of Congress to said territory, except to the extent modified or repealed by this act, are hereby ratified and confirmed to said state, subject to the provisions of this act: Provided, however, that nothing in this act contained shall, directly or indirectly, affect any litigation now pending and to which the United States is a party, or any right or claim therein asserted."

Confirmation itself neither adds to nor detracts from the original title. Boquillas Land & Cattle Co. v. Curtis, 213 U. S. 339, 29 S. Ct. 493, 53 L. Ed. 822. It is a recognition or acknowledgment of a title which existed, and as it existed. Jones v. St. Louis Land & Cattle Co., 232 U. S. 355, 34 S. Ct. 419, 58 L. Ed. 636.

There is no repeal of any grant which had taken effect except that of saline lands for University purposes. So, giving effect to section 12, there is no change in the original grant, except "to the extent modified" by the Enabling Act. Any modifications will appear in sections 7, 8, 9, 10, and 11.

Section 7 repeals saline land grants, except as approved selections had already been made. In lieu thereof, and of

certain other grants customarily made to new states, or made applicable by general law to new states on their admission (two of which grants had already been by the Ferguson Act made inapplicable to New Mexico), this section made numerous grants, most of which are obviously supplemental to grants already made by the Ferguson Act.

Sections 8 and 9 are mere re-enactments of sections 4 and 5 of the Enabling Act.

The first part of section 10, being the first quotation at page 63 of the Llewellyn opinion (167 P. 414), is of prime importance in determining what modification took place. It may be thus stated: (1) It transfers and confirms to the state the lands granted in section 7, and also all lands theretofore granted to the territory. (2) Such lands are to be held in trust to be disposed of (a) only in the *manner* as *herein* (in the Enabling Act) provided; and (b) for the several *objects* specified in the respective *granting* and *confirmatory* provisions. (3) The natural products and money proceeds are to be subject to the same trusts as the lands producing them. This analysis discloses considerable modification of the Ferguson Act. The declaration of an express trust was new. This was done, and the right reserved to prevent violation of the trust by a suit by the Attorney General in the United States courts (later provision of section 10) in order, no doubt, to meet decisions of the United States Supreme Court that, under some grants for specific purposes, the application of the proceeds of the lands to the declared purposes rested in the good faith of the state and could not be controlled even by Congress. Mills County v. Burlington, etc., R. Co., 107 U. S. 557, 2 S. Ct. 654, 27 L. Ed. 578; Hagar v. Reclamation District, 111 U. S. 701, 4 S. Ct. 663, 28 L. Ed. 569; United States v. Louisiana, 127 U. S. 182, 8 S. Ct. 1047, 32 L. Ed. 66.

The former *manner* of disposition—that is, of sale and leasing—is completely superseded. Other provisions of section 10 contain the new regulations. Then follow regulations as to the establishing, maintaining, safeguarding, and investment of funds in which "any moneys * * * in

any manner derived from any of said land" are to be deposited.

Section 11 is not important in this discussion.

So much of modification there doubtless was. But, as to the *objects* for which the lands may be disposed of, we find none. To ascertain such objects we are to consult "the respective granting and confirmatory provisions." As to the 65,000 acres here involved, the granting provision is section 3 of the Ferguson Act and the confirmatory provisions are sections 10 and 12 of the Enabling Act. We must construe them together. As to the additional 200,000 acres, the granting clause is section 7 of the Enabling Act. The object of the 200,000-acre grant is expressed only as "for University purposes." Appellant contends that the object expressed in section 3 of the Ferguson Act ("for the use of said University") has the same meaning, as no doubt it has. But the object of the earlier grant, as plainly appears, was more specific. It was to provide a "permanent fund" or endowment for the University. That continues to be the object, unless the restriction has been removed, which it has not.

It is urged that Congress intended the same object in its original and supplemental grants for University purposes, and that it could not have intended an endowment of 65,000 acres and an unrestricted grant of 200,000 acres. The argument is not without force. But it does not lead to the necessary inference of an intent to destroy the endowment feature of the earlier grant. Preferably it brings the endowment feature into the new grant. The two acts cover the same subject-matter and have nearly the same scope. The later is additional and supplemental. In the earlier Congress had plainly pursued its historic policy of endowing Universities and Agricultural Colleges. Having once expressed that purpose, it was deemed unnecessary to reiterate it. It was the "object" to which Congress referred. The provisions of section 10 of the Enabling Act, as to the establishment of separate funds for maintaining their integrity and investing them, are entirely consistent with this view. Standing alone, those provisions perhap were a weak foundation upon which to erect an

endowment; but, when we find the endowment already in existence, it is easy to perceive that Congress was only adding to it and further safeguarding it.

We have already noted that, under the Ferguson Act, section 10, there could be no sale of University lands. Why, then, the provision of section 3 that proceeds of sales (of which there were to be none) should constitute a permanent fund? If sections 3 and 10 were intended to be the final word on the subject, the question could not be answered. Section 3 contemplated future provision for sale of the lands. It came with the Enabling Act. But Congress did not wait to declare the policy of endowment. The University was given no reason to think that its grant was, or was to be, unrestricted. Pending admission to statehood, the University might enjoy the income from the lands themsleves, with the expectation of future authorization of sales for the creation of a permanent fund.

Of course, Congress could have reversed such policy. But it did not. It strengthened it. The time for authorizing sales having arrived, what did it do? It declared an enforceable trust, realizing that the new state might not be willing patiently to await the growth of its University endowment, but might be tempted by present needs to dissipate its patrimony. Ervien v. U. S., 251 U. S. 41, 40 S. Ct. 75, 64 L. Ed. 128. It made the natural products and money proceeds of the lands subject to the same trusts. It made more stringent regulations as to the separation, investment, and safeguarding of the funds. It did nothing to indicate a departure from or relaxing of its originally declared policy to endow the common schools, the University, and the Agricultural College. It confirmed the old grants to be held in trust for the objects originally expressed. As pointed out in the Llewellyn decision, some of those objects involved expenditure of the corpus or capital. But others involved accumulation and permanent holding.

So we are convinced that the Llewellyn decision, as to the point here involved, whether dictum or not, is sound. We cannot doubt that the Ferguson Act and the Enabling Act are in pari materia. They must be read and construed

together to determine the policy of Congress. So read, we are satisfied that the state's compact with the United States requires proceeds of sales of University lands, and of natural products thereof, to be accummulated in a permanent fund. Under the admission that the oil royalties here in question are proceeds of sales of natural products, it must be held that appellees have correctly placed them in the permanent fund.

It follows that the judgment of the court below is correct, and should be affirmed, and the cause remanded; and it is so ordered.

BICKLEY and WATSON, JJ., concur.