## THE COUNTY OF CLARK, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 3486

October 29, 1948.          199 P.2d 137.

*Robert E. Jones,* District Attorney of Clark County, of Las Vegas, and *Thatcher, Woodburn & Forman,* of Reno, for Appellant.

*Alan Bible,* Attorney General, *W. T. Mathews,* Special Assistant Attorney General, and *George P. Annand,* and *Homer Mooney,* Deputy Attorneys General, for Respondent.

## OPINION

*Per Curiam:*

Appellant county filed action against the State of Nevada on November 24, 1944 for a declaration of its rights in certain sums of money paid by the United

States to the State of Nevada under the "Boulder Canyon Project Adjustment Act" of the United States Congress approved July 19, 1940, 43 U.S.C.A. sec. 618 et seq.

The allegations of the complaint material to this appeal are as follows:

"I. The plaintiff, the County of Clark, is one of the counties of the State of Nevada, created and existing under and by virtue of an Act of the Legislature of the State of Nevada * * * That said County of Clark is a lawful taxing political subdivision of the State of Nevada.

"II. That this action is commenced and maintained by the County of Clark pursuant to direction and lawful order of the County Commissioners of the County of Clark, and is commenced and maintained against the State of Nevada under and pursuant to an Act of the Legislature of the State of Nevada entitled 'An Act providing that this state may be sued by any county herein, in which a water storage and hydroelectric project owned by the United States is situated, for the purpose of determining whether or not such county is entitled to any part of money derived from said project and paid by the United States to this state pursuant to any Act of Congress, making an appropriation for the defense of any such suit, and other matters properly relating thereto,' approved March 24, 1943.

"III. That the Colorado River is a large, natural, interstate stream having its principal headwaters in the state of Wyoming, Colorado and Utah, and flowing in a general southwesterly direction through the states of Wyoming, Colorado and Utah and along a common boundary of the States of Arizona and Nevada and along a common boundary of Arizona and California, and thence through the Republic of Mexico and emptying into the Gulf of California; also one of the large tributaries of said Colorado River although having its headwaters in the State of Colorado flows through the State of New Mexico for a very considerable distance before

its confluence with the Colorado River. That all of the Colorado River within the State of Nevada from the Arizona line on the north to the California line on the south is a navigable stream for the purpose of fixing ownership of the banks and bed thereof and that title to the land below the high water mark thereof is held by the State of Nevada insofar as they lie within said state. That all of the Colorado River within the State of Nevada lies and is situate in the County of Clark.

"IV. That said Colorado River, as it flows through the State of Nevada and Clark County, is a great, natural resource of inestimable value to the State and to said county; that as it flows through said State and County, it is bounded both upon the Nevada and Arizona sides by walls of great height and of such geological structure as made feasible the erection in and across said stream of a dam of great height at and in Black Canyon; that the topography of the county back of said dam and dam-site at Black Canyon is such that tremendous quantities of water, exceeding 20,000,000 acre-feet, can be and are backed up and stored in a great reservoir capable of providing storage water for the irrigation of approximately 100,000 acres of land in the State of Nevada, approximately 1,000,000 acres of land in the State of Arizona, and several times as much in the southern part of the State of California, and in addition thereto provide water for domestic and industrial purposes to the constantly and rapidly growing needs of the city and county of Los Angeles and the surrounding territory.

"The great height of the dam at Black Canyon, feasible because of the height of the canyon walls, the great volume of stored water created by the dam and the resultant fall of water have made possible the generation at Boulder Dam with the generating facilities heretofore installed of as much as six billion kilowatt hours of electric energy, during an annual period of operation, which electric energy to a very large extent, has been

and is transmitted to the city and county of Los Angeles and Southern California area for domestic, industrial, and municipal uses at very low costs. That all of these matters were known to the Secretary of the Interior and to Congress at the time of the selection of Black Canyon as a site for said dam and said site was so selected by the Secretary of the Interior and by Congress with the advice of the engineering staff of the Bureau of Reclamation, experienced in such matters.

"V. That thereafter and on December 21, 1928, the Congress of the United States for the purpose of controlling the floods, improving navigation, and regulating the flow of the Colorado River, providing for storage and for the delivery of stored water thereof, for the reclamation of public lands, and other beneficial uses exclusively within the United States, and for the generation of electric energy as a means of making the project authorized thereby, commonly known as the Boulder Canyon Project, self-supporting and financially solvent, and for various other purposes, enacted what is known as the 'Boulder Canyon Project Act,' and therein and thereby provided for the construction of a dam in the Colorado River at Black Canyon in the State of Nevada and Arizona. * * *

"That said Act was subsequently amended by the adoption of an Act of Congress known as the 'Boulder Canyon Project Adjustment Act' approved July 19, 1940. That each and all of the conditions precedent to the taking effect of said 'Boulder Canyon Project Act' and said 'Boulder Canyon Project Adjustment Act' have occurred, and said Acts, including the retroactive provisions thereof, have been in full force and effect ever since June 1, 1937.

"VI. That in recognition of the great value of this natural resource to the State of Nevada and to Clark County, the Congress of the United States by the 'Boulder Canyon Project Act' enacted that 18-¾% of

certain excess revenue, as in said Act defined, should be paid to the State of Nevada, which provision was subsequently amended to provide that in lieu and in commutation of such percentage payment there should be paid to the State of Nevada annually the sum of $300,-000., subject to certain conditions and provisions as hereinafter alleged; that in making provision for such payments to the State of Nevada, it was the intent of Congress that said payments were in lieu of taxes and to compensate the State of Nevada and its lawful taxing political subdivisions for loss in revenue which would be occasioned to the State and its lawful taxing political subdivisions by reason of the ownership of said project by the United States.

"VII. That in and by said Acts of Congress, the Secretary of the Treasury was authorized to advance moneys to the 'Colorado River Dam Fund' to be repaid out of revenue, provided, however, that before any money be appropriated to the construction of the dam or power plant or any construction work done or contracted for the Secretary of the Interior should make provision for revenues by contract for the sale and delivery of electric energy or falling water for the generation of electric energy adequate in his judgment to insure the payment of all expenses of operation and the maintenance of said works incurred by the United States and the repayment within fifty years from the date of the completion of said works of all amounts advanced to the fund, with interest thereon, as made reimbursable under the provisions of said Act. That all of said conditions and duties so imposed upon the Secretary of the Interior have been performed.

"That in and by said 'Boulder Canyon Project Act,' it was provided that if during the period of amortization of said advances, the Secretary of the Interior should receive revenue in excess of the amount necessary to meet the periodical payments to the United States, then

after the settlement of such periodical payment he should pay to the State of Nevada 18-¾% of such excess revenue.

"That subsequently and under and by virtue of the provisions of the 'Boulder Canyon Project Adjustment Act,' the Secretary of the Interior was authorized and directed to promulgate charges for a basis of computation thereof for electric energy generated at the Boulder Dam during the period beginning June 1, 1937 and ending May 31, 1987, and from the funds so received, together with other net revenue from the project, after meeting certain charges and costs of operation and maintenance and repayment to the Treasury, with interest, of advances to the 'Colorado River Dam Fund' for the project made prior to June 1, 1937 and such portion of advances made on and after said June 1, 1937, to provide the sum of $600,000. for each of the years beginning with the year of operation commencing June 1, 1937 and ending May 31, 1938 and continuing annually thereafter until and including the year of operation ending May 31, 1987, of which said sum $300,000. was required to be paid to the State of Nevada for each such year of operation aforesaid and a like sum to the State of Arizona, such payments to be made from revenue received from the 'Colorado River Dam Fund.' That said payments so provided to be made to the State of Nevada and to the State of Arizona were in commutation of the payments provided to be made to the State of Nevada and Arizona under the provisions of the 'Boulder Canyon Project Act' and in commutation and in lieu of the 18-¾ of the excess revenue provided to be made to said states respectively under the provisions of said 'Boulder Canyon Project Act.'

"VIII. That under and pursuant to said 'Boulder Canyon Project Act,' the Secretary of the Interior of the United States erected a dam at Black Canyon in the Colorado River extending from Clark County on the Nevada side into the State of Arizona, and thereby

created a storage reservoir of a capacity of not less than 20,000,000 acre-feet of water, a very large amount of said water storage being situated in the County of Clark, and in connection therewith erected and installed, both in the State of Arizona and in Clark County, in the State of Nevada, a large hydroelectric project capable of and which ever since June 1, 1937 has been generating and delivering electric energy adequate, as sold under agreements between the Secretary of the Interior and the purchasers and allottees, to insure payments of all expenses of operation and maintenance of said project incurred by the United States and the repayment within fifty years from the date of the completion of said works of all amounts advanced to the fund under said Acts of Congress, with interest thereon, and to provide funds necessary to be paid into the 'Colorado River Dam Fund' and to pay to each of the States of Nevada and Arizona the sum of $300,000. annually as in said 'Boulder Canyon Adjustment Act' provided.

"IX. That it was the intent of Congress, in making provision for said payment to the State of Nevada of $300,000. annually on and after the year of operation commencing June 1, 1937 and ending May 31, 1938 and until the year of operation ending May 31, 1987, that said payments were in lieu of taxes and to compensate the State of Nevada and its political subdivisions and lawful taxing political subdivision in which said project was situate for the loss in revenue which would be occasioned to the State, its political subdivisions and lawful taxing political subdivisions, by reason of the ownership of said project by the United States; that in and by said Act it was specifically provided that should the State of Nevada or its lawful taxing political subdivisions levy and collect by and under authority of the State of Nevada or by any lawful taxing political subdivision thereof taxes upon

"(i) the project as defined by said Act of Congress;

"(ii) the electrical energy generated at Boulder Dam

by means of facilities, machinery, or equipment both owned and operated by the United States, or owned by the United States and operated under contract with the United States;

"(iii) the privilege of generating or transforming such electrical energy or of use of such facilities, machinery, or equipment or of falling water for such generation or transforming; or

"(iv) the transmission or control of such electrical energy so generated or transformed (as distinguished from the transmission lines and other physical properties used for such transmission or control) or the use of such transmission lines or other physical properties for such transmission or control;

"that payment to the State of Nevada shall be reduced by an amount equivalent to such taxes.

"It was further provided in said Act that in the event payment to the State of Nevada should be reduced by reason of the collection of taxes as aforesaid, that adjustment should be made from time to time with each allottee which should have paid any such taxes by credits or otherwise for that proportion of the amount of such reductions which the amount of the payment of such taxes by allottees bears to the total amount of such taxes collected.

"X. That since the year 1937, neither the State of Nevada nor the County of Clark, a lawful taxing political subdivision thereof, has levied or collected any taxes or imposed any license fees upon (i) the project as defined by said Acts of Congress; (ii) the electrical energy generated at Boulder Dam by means of facilities, machinery, or equipment both owned and operated by the United States, or owned by the United States and operated under contract with the United States, (iii) the privilege of generating or transforming such electrical energy or of use of such facilities, machinery, or equipment or of falling water for such generation or transforming; or (iv) the transmission or control of such

electrical energy so generated or transformed (as distinguished from the transmission lines and other physical properties for such transmission or control) or the use of such transmission lines or other physical properties for such transmission or control.

"That for each operating year, commencing June 1, 1937, and ending May 31, 1938, and thereafter up to and including the operating year ending May 31, 1943, the Secretary of the Interior has paid to the State Treasurer and the State of Nevada the sum of $300,000. and an aggregate of $1,800,000. All of which has been retained by said State Treasurer and the State of Nevada save and except the sum of $240,000. * * *

"That by reason of the deferment of Clark County to levy and collect or impose taxes against (i) the project; or (ii) the electrical energy generated at Boulder Dam by means of facilities, machinery, or equipment both owned and operated by the United States, or owned by the United States and operated under contract with the United States; or (iii) the privilege of generating or transforming such electrical energy or of use of such facilities, machinery, or equipment or of falling water for such generation or transforming; or (iv) the transmission or control of such electrical energy so generated or transformed of such facilities, machinery, or equipment or of falling water for such generation or transforming; or (v) the transmission or control of such electrical energy so generated or transformed (as distinguished from the transmission lines and other physical properties for such transmission or control) or the use of such transmission lines or other physical properties for such transmission or control; and because of the retention by the State of Nevada of all of said sums so paid by the Secretary of the Interior to the State Treasurer of Nevada, the County of Clark has lost and been deprived of large amounts of revenue and a share and part of the money that has been derived from said project by virtue of the ownership thereof by the United

States and paid to the State of Nevada by the Secretary of the Interior for the United States pursuant to the Acts of Congress hereinbefore referred to and described.

"XI. That for the year 1938 the tax rate of the State of Nevada levied and collected against all property, real and personal, in said state, including the net proceeds of mines, except properties exempt by law from taxation, was $.73, and the county tax rate of the County of Clark levied and collected against all property, real and personal, in said county, including the net proceeds of mines, except property exempt by law from taxation was $1.60; similarly, for the years 1939 to 1944, both inclusive, the tax rates, respectively, of the State of Nevada and the County of Clark were as follows:

|      | State | County |
|------|-------|--------|
| 1939 | $.58  | $1.58  |
| 1940 | .58   | 1.82   |
| 1941 | .695  | 1.625  |
| 1942 | .695  | 1.405  |
| 1943 | .58   | 1.10   |
| 1944 | .58   | 1.77   |

"That the plaintiff is entitled to that proportion of each of the annual payments of $300,000. so made to the State Treasurer of the State of Nevada by the Secretary of the Interior under and pursuant to the 'Boulder Canyon Project Adjustment Act' as its county tax rate in each year bears to the aggregate of the state and county tax rate for said year. * * *"

Defendant demurred to the complaint upon the grounds (1) that the court has no jurisdiction of the subject of the action, and (2) that the complaint does not state facts sufficient to constitute a cause of action. The lower court sustained the demurrer on both grounds in a written opinion holding that the plaintiff was not entitled to any of the money so paid to the State of Nevada. Upon the failure of the plaintiff to amend its complaint or otherwise to plead, the court on motion

of defendant entered its judgment of dismissal from which this appeal is taken.

This action is brought pursuant to an act of the Nevada legislature approved March 24, 1943, 1943 Statutes of Nevada, p. 260, which provides: "Any county in this state in which is situated any water storage and hydroelectric project owned by the United States, may commence an action against the State of Nevada, and have determined by such action, whether or not such county is entitled to any part of money that may have been derived from such project and paid to this state by the United States, pursuant to any act of Congress."

■ Appellant earnestly contends that independently of the court's ruling on the general demurrer it was reversible error to sustain the demurrer on the ground of lack of jurisdiction in view of the foregoing jurisdictional act. By the act the state waived its immunity to suit and permitted the county to sue, and likewise definitely vested in the district court jurisdiction of the subject matter. Had the court dismissed the action solely upon the ground of lack of jurisdiction or had it sustained the demurrer solely upon this ground, the contention of appellant would be sound. However, it is clear from a reading of the opinion of the learned district judge that his conclusion in this respect was simply that to sustain appellant's contention that the intent of Congress in passing the Boulder Canyon Project Act, 43 U.S.C.A. sec. 617 et seq., and the Boulder Dam Adjustment Act was that the moneys payable to the state were in lieu of taxes that could have been levied had the project been privately owned and constructed, the court would have to write back into the act words that had been deliberately stricken by Congress. The learned district judge further concluded that to do this would be to indulge in "judicial legislation" and that the court had no jurisdiction to legislate. It was in this

sense that the district court determined that it had no "jurisdiction." Perhaps a more happy choice of language could have been used in carrying this thought into judgment.

■ In like manner we are able to dispose without too great difficulty of the contention that inasmuch as the state's jurisdictional act recognized a justiciable controversy, the plaintiff county had the statutory right to have the court determine by declaratory judgment for or against plaintiff's contention as to whether or not it was entitled to any of the money paid or to be paid by the United States to the State of Nevada under the Adjustment Act. School District No. 19 v. Sheridan County, 130 Kan. 421, 286 P. 230. Rehearing denied 130 Kan. 749, 288 P. 733. If the facts were in dispute this would be true and we might in such event be inclined to reverse the judgment entered in favor of defendant upon the sustaining of its general demurrer and remand the cause to the district court with instructions to overrule the demurrer on both grounds and to proceed to find the facts, adjudging therefrom whether or not the plaintiff was entitled to receive any of the money paid or to be paid to the defendant state under the Adjustment Act. However, not only has the plaintiff, county refused to amend its complaint, but also, as stated by counsel for appellant during the course of his oral argument, the facts are not in dispute. It therefore appears that the plaintiff has had, under the theory presented by it in the district court, a full and fair determination of its rights by such court (which is a further conclusive reply to its assignment of error for sustaining the demurrer for want of jurisdiction) after a full consideration of the undisputed facts alleged in the complaint. The pertinent facts, as recited in the complaint, appear in the beginning of this opinion, from which it appears that the gravamen thereof is the allegation "that in making provision for such payments to

the State of Nevada, it was the intent of Congress that said payments were in lieu of taxes to compensate the State of Nevada and its lawful taxing political subdivisions for loss in revenue which would be occasioned to the state and its lawful taxing political subdivisions by reason of the ownership of said project by the United States." This is emphasized by successive repetitions of the same allegation. It is clear, therefore, that in refusing to adopt the plaintiff's construction of the Adjustment Act and in refusing to read into the act the intent of Congress as contended for by the plaintiff and, in consequence of such refusal, determining that the complaint did not state a cause of action in the sense that relief could not be given to plaintiff by a declaratory judgment, the judgment entered in favor of defendant, after plaintiff elected not to amend, was in effect a declaration of the rights of the parties. It is true that the judgment appearing in the record simply recites the court's "decision, ruling and order" sustaining the demurrer on both grounds, the refusal of the plaintiff to amend, and its election to stand upon its complaint, and orders, adjudges and decrees that the action be dismissed. It is true also that our declaratory judgment act of March 4, 1929, Stats.1929, page 28, N.C.L. sec. 9440 et seq., requires: "The declaration may be either affirmative or negative in form and effect." The statute further provides, however, that "Any person * * * whose rights * * * are affected by a statute * * * may have determined any question of construction * * * arising under the * * * statute * * * and obtain a declaration of rights, status or other legal relations thereunder." In sustaining the general demurrer the district court construed the federal statute in question and concluded that the plaintiff county did not have the rights claimed thereunder, and although the judgment is simply one of dismissal the record on appeal places before us the written opinion and decision of the learned district

judge comprising some thirty pages which deals with many problems including the plaintiff's asserted construction and interpretation of the act in question. We thus have before us what amounts to a declaration of the rights of the parties. In the recent opinion of this court in Kress v. Corey, 65 Nev. 1, 189 P.2d 352, dealing at length with declaratory judgments, we noted that appellant and respondents had both discussed at length in their briefs the question of the propriety of the action of the lower court in "dismissing" the amended complaint upon sustaining the general and special demurrers thereto, but there we found it unnecessary to pass upon the points raised in view of the fact that we held the amended complaint to state a cause of action not merely for a declaratory judgment but also for the affirmative relief prayed for. In view of the nature of the record before us, we cannot see in what manner appellant has been prejudiced by the court's failure to enter a more formal judgment declaring the rights of the parties, although it may well be that in some cases a mere dismissal of the action without formal declaration of such rights might prove to be reversible error. Further discussion of this preliminary point does not appear to be warranted.

As hereinbefore noted plaintiff based its claim to part of the money paid to the State of Nevada by the United States under the "Adjustment Act," upon the theory that it was the intent of Congress "that said payments were in lieu of taxes and to compensate the State of Nevada and its lawful taxing political subdivisions for loss in revenue which would be occasioned * * * by reason of the ownership of said project by the United States." Argument in the lower court was based on such theory alone. On this appeal, however, plaintiff has changed its theory and states in the reply brief that "the payments provided by the Adjustment Act are not and never were intended to be made to the State of Nevada in lieu of taxes which could have been levied on

the project by the state if it were privately owned."
Plaintiff goes on to say: "It is admitted by appellant
that the theory set forth in the brief filed in this Court
is not the same advocated before the lower court. This
admitted change in theory is due to the fact that the
attorney in charge of the case in the lower court is now
deceased and that the case has come into the hands of
other counsel who is not in agreement with the theory
advocated in the lower court and who was of the opinion
that such theory was not sustained on the face of the
Adjustment Act itself."

Plaintiff states its present theory as follows: "The
liability of the state to the county is not founded upon
any intent of Congress that the money should be divided
between the two but is founded upon the proposition
that the State of Nevada has received for its use and
benefit moneys which are in commutation of taxes upon
properties situate in Clark County and that the State
of Nevada is, by pocketing all of the payments, in effect,
remitting all taxes upon those properties by the county.
The liability of the state to the county is predicated
upon the fact that the state, through a bilateral contract
with the United States, has promised not only for itself
but for Clark County that no taxes of any kind or
character will in the future be levied upon the Boulder
Dam Project, upon the electrical energy generated there-
from, or upon the generation, transmission or control
of such energy regardless of the fact that such properties
in the hands of persons other than the United States
could be legally taxed. It is appellant's contention that
such being the case the State of Nevada may not con-
stitutionally exempt from taxes properties situate in
Clark County without a consideration to such county in
the form of a share in the payments made under the
contract with the United States."

In concluding its final appeal brief plaintiff states:

"(a) The payments to the State of Nevada are not in
lieu of taxes which the State or its subdivisions could

have levied if Boulder Dam had been privately constructed:

"(b) The payments under the Adjustment Act are not gifts, grants or donations from the United States to the State:

"(c) In making such payments, it was the intent of Congress to buy off a nuisance value of state, county and city taxation which would defeat the purpose of Congress to make the Project self-supporting by the sale of electrical energy therefrom:

"(d) Such being the congressional intent, the payments made to the State are in lieu of taxes on allottees and contractees of the production of the Dam and must be equitably shared by the State and County."

■ It has long been a rule of this court that a party on appeal cannot assume an attitude or adopt a theory inconsistent with or different from that taken at the hearing below. Wheeler v. Hurley, 49 Nev. 70, 236 P. 559; Carroll v. Carroll, 51 Nev. 188, 272 P. 3; Berrum v. Georgetta, 60 Nev. 1, 93 P.2d 525, 98 P.2d 479; In re Torres Estate, 61 Nev. 156, 120 P.2d 816, 135 A.L.R. 481; Edmonds v. Perry, 62 Nev. 41, 140 P.2d 566; Johnston v. DeLay, 63 Nev. 1, 158 P.2d 547. But plaintiff argues that despite its change in theory it was unnecessary to amend the complaint, because the complaint contains sufficient facts to state a cause of action under either theory and that under its newly advanced theory it is entitled to the relief prayed for. In order to show in any event that plaintiff cannot contend that the lower court's ruling on demurrer prevented it from having a full and fair determination of its rights by this court, we deem it necessary to give our opinion with respect to plaintiff's new theory for relief, but we do so reluctantly because the matter was not presented to the court below.

An offer by the United States and an acceptance by the State of Nevada to pay and receive said $300,000 annual payments must appear from the allegations of

the complaint before the court, under plaintiff's present bilateral contract theory, would be justified in declaring the plaintiff county entitled to the relief prayed for. If we disregard as legal conclusions the allegations that said payments are in lieu of taxes that could have been levied if the project had been owned by a taxable entity, as plaintiff asks us to do on this appeal, then the only allegation remaining in the complaint which tends to show the reason why such annual payments are being made appears in paragraph VI thereof as follows: "That in recognition of the great value of this natural resource to the State of Nevada and to Clark County, the Congress of the United States * * * enacted * * * that there should be paid to the State of Nevada annually the sum of $300,000 * * * subject to certain conditions and provisions as hereinafter alleged." The terms and conditions referred to are found in paragraph IX of the complaint. Is such an allegation sufficient in itself to show an offer on the part of the United States to enter into a bilateral contract with the State of Nevada wherein said state promises in consideration thereof for itself and Clark County that no taxes will be levied upon the Boulder Dam Project or against the allottees and contractees of the production of such project, when nothing in the nature of a promise or act on the part of the State of Nevada as consideration thereof is alleged other than the receipt of such payments by the State of Nevada as and when made?

■ Nowhere does it appear from the complaint that the State of Nevada promised for itself or for Clark County or for both that no taxes of any kind or character would be levied upon the Boulder Dam Project, upon the electrical energy generated therefrom, or upon the generation, transmission or control of such energy. Plaintiff even admits in its brief that "Congress saw fit to make provision for the payment of $300,000 annually to the State of Nevada and specifically made deductible from such payments any taxes which might be levied

or collected by the state or its political subdivisions." We conclude, therefore, that the complaint on its face contains neither an offer nor an acceptance which could be the basis of any bilateral contract. The federal government nowise has bound itself by a bilateral contract to continue these payments for the fifty-year period as provided in said Adjustment Act. In effect all that the United States says is that it will continue to make such payments annually to the State of Nevada for a certain period, with a condition subsequent that if certain taxes are levied and collected, the annual payments will be reduced in the amount of such taxes. There having been no obligation on the part of the United States to agree to make said payments to the State of Nevada, but merely a "desire" on the part of the federal government to recognize "the great value of this natural resource to the State of Nevada and to Clark County," the payments stand as a gift or grant from the federal government to the state, and as to such the law is clear that the county is not entitled to receive specific portions thereof. King County v. Seattle School District, 263 U.S. 361, 44 Sup.Ct. 127, 128, 68 L.Ed. 339.

In the King County case the State of Washington received certain money under a congressional grant, part of which after it was turned over to the county the school district sued to recover. The United States Supreme Court in holding that the school district had no cause of action said: "When turned over to the state, the money belongs to it absolutely. There is no limitation upon the power of the legislature to prescribe how the expenditures shall be made for the purposes stated, though, by the act of Congress, 'there is a sacred obligation imposed on its public faith.' Cooper v. Roberts, 18 How. 173, 181, 182, 15 L.Ed. 338 [341]; Alabama v. Schmidt, 232 U.S. 168, 173, 34 S.Ct. 301, 58 L.Ed. 555 [558]; Mills County v. Burlington & M. River R. Co. 107 U.S. 557, 566 2 S.Ct. 654, 27 L.Ed. 578 [581]; Hagar

v. Reclamation Dist., 111 U.S. 701, 713, 4 S.Ct. 663, 28 L.Ed. 569 [574]. No trust for the benefit of appellee is created by the grant. But, assuming the moneys paid over to the state are charged with a trust that there shall be expended annually one-half for schools and one-half for roads, the appellee has no right to enforce the trust. Congress alone can inquire into the manner of its execution by the state. United States v. Louisiana, 127 U.S. 182, 185–192, 8 S.Ct. 1047, 32 L.Ed. 66 [68, 70]; Mills County v. Burlington & M. River R. Co., supra [107 U.S. 557, 566, 2 S.Ct. 654, 27 L.Ed. 578, 581]; [American] Emigrant Co. v. Adams County, 100 U.S. 61, 69, 25 L.Ed. 563 [566]; Barrett v. Brooks, 21 Iowa, 144, 148. See, also, Stearns v. Minnesota, 179 U.S. 223, 231, 21 S.Ct. 73, 45 L.Ed. 162 [168]. The act does not direct any division of the money between schools and roads. Its language above quoted indicates an intention on the part of Congress that the state in its discretion may prescribe by legislation how the money is to be expended. No distribution to the appellee or any other school district is required. The public schools and public roads are provided and maintained by the state or its subdivisions, and the moneys granted by the United States are assets in the hands of the state to be used for the specified purposes as it deems best."

The payments under the Adjustment Act being gifts to the State of Nevada, it follows that it was not the intent of either the United States or the State of Nevada in making and accepting such payments to deprive Clark County of any of its taxing rights.

As to whether the state or county could assess and collect taxes against any of the four items specified in paragraph IX of the complaint, or in other words, as to whether any of such items are taxable by the county or state, we express no opinion. But we do say that if any such items are so taxable, there is nothing in the Project Act or in the Adjustment Act to prevent the

levy and collection of taxes thereon by the county of Clark, and said county's failure heretofore to seek revenue from such sources if, indeed, such are available to it, cannot be laid to plaintiff county's reliance upon a bilateral contract which is nonexistent in the pleadings and nonexistent in fact.

The judgment of the district court is hereby affirmed.

EATHER, C. J., BADT, J., and FRANK MCNAMEE, District Judge, concur.

HORSEY, J., being disqualified, the Governor designated Honorable FRANK MCNAMEE, Judge of the Eighth Judicial District, to sit in his stead.